**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUL 29 2004**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**
**TENTH CIRCUIT**

RODERICK L. SMITH,

      Petitioner-Appellant,

v.

MIKE MULLIN, Warden, Oklahoma
State Penitentiary,

      Respondent-Appellee.

No. 02-6055

**Appeal from the United States District Court**
**for the Western District of Oklahoma**
**(D.C. No. CIV-98-601-R)**

Jack D. Fisher of Edmond, Oklahoma, for Petitioner-Appellant.

Robert L. Whittaker, Assistant Attorney General, Criminal Division (W.A. Drew
Edmondson, Attorney General, with him on the brief), State of Oklahoma,
Oklahoma City, Oklahoma, for Respondent-Appellee.

Before **SEYMOUR**, **HENRY**, and **O'BRIEN**, Circuit Judges.

**SEYMOUR**, Circuit Judge.

Roderick Lynn Smith, an Oklahoma state prisoner, was sentenced to death

for the 1993 murders of his wife and stepchildren. Challenging his convictions

and death sentence, Mr. Smith petitioned for a writ of habeas corpus in federal

district court pursuant to 28 U.S.C. § 2254.[1] The district court denied relief in an

unpublished opinion, but granted a Certificate of Appealability (COA), *see* 28

U.S.C. § 2253(c)(1), on eight of the eighteen claims before it.[2] We affirm in part,

reverse in part, and grant a writ of habeas corpus vacating Mr. Smith's death

sentence, with the condition that the state resentence Mr. Smith within a

reasonable time.

## I.

## BACKGROUND FACTS AND PROCEDURE

The Oklahoma Court of Criminal Appeals (OCCA) aptly described the facts

surrounding Mr. Smith's crimes in its opinion affirming his convictions and

sentences on direct appeal:

> [Mr. Smith] was married to Jennifer Smith, who had four

---

[1]In referencing the voluminous record in this case, we will cite the state trial transcript as "Tr.," the original record in state court as "O.R.," the state's trial exhibits as "St. Ex.," motion transcripts as "Motion Tr." followed by their dates, the transcript of the evidentiary hearing in federal district court as "E.H.," and the record in federal court as "Rec."

[2]On appeal, Mr. Smith has abandoned his claim regarding suppression of exculpatory evidence. Aplt. Br. at 2.

children from a prior relationship: ten year old Shemeka Carter, nine year old Glen Carter, Jr., seven year old Ladarian Carter, and six year old Kanesha Carter. The children lived with [Mr. and Mrs. Smith].

On the morning of June 28, 1993, [Mrs. Smith's] mother called the police and asked them to check her daughter's house. She had not seen or heard from [Mrs. Smith] since June 18, 1993. When Officer Peterson arrived at the [Smith] residence . . . , the house appeared to be secured and no one answered the doors. Because he noticed an odor of decaying flesh and a large number of flies around the windows, he contacted his supervisor, Lieutenant Wayne Owen, who came to the address. Owen and Peterson entered the house through a window. Inside, they discovered a dead woman in one closet and a dead child in another. They called the homicide division of the Oklahoma City Police Department and secured the house. Once homicide detectives arrived, the rest of the house was searched. The bodies of three more children were found, two in closets and a third under a bed. The bodies were determined to be those of Jennifer Smith and her four children. They were determined to have been dead for at least two to three days and up to . . . two weeks or more.

The afternoon of that same day, . . . [Mr. Smith] walked into the Oklahoma County Sheriff's Office. He was turned over to the Oklahoma City Police and placed under arrest. During a custodial interrogation, [Mr. Smith] told Detectives Bemo and Cook that he had been laid off his job as head janitor at Washington Irving Elementary School because the company that he worked for had lost its contract. According to [Mr. Smith], when he told his wife this news a fight ensued. At one point [Mrs. Smith] grabbed a knife and he took the knife from her and stuck her with it. When the boys came to their mother's defense, he stuck them with the knife as well. Although [Mr. Smith] admitted that he "got" the girls also, he could not remember any details. [Later, authorities determined the girls died of asphyxiation.] [Mr. Smith] told the police where he placed each of the bodies.

*Smith v. State*, 932 P.2d 521, 526 (Okla. Crim. App. 1996).

An Oklahoma County jury convicted Mr. Smith of five counts of first-degree murder and recommended sentences of death on each count, which the

court imposed. Mr. Smith unsuccessfully filed a direct appeal, *see id.* at 539, followed by an unsuccessful application for post-conviction relief in the Oklahoma courts, *see Smith v. State*, 955 P.2d 734 (Okla. Crim. App. 1998). Mr. Smith then filed this habeas petition. The district court granted an evidentiary hearing on four grounds and heard five days of testimony, ultimately denying relief.

## II.

### APPLICATION OF AEDPA AND PROCEDURAL BAR

Because Mr. Smith filed his habeas petition after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (1996), the provisions of that act apply to this appeal. *See Smallwood v. Gibson*, 191 F.3d 1257, 1264 (10th Cir. 1999).

> Under these provisions, a federal court is precluded from granting habeas relief on any claim adjudicated on the merits by the state court, unless the state proceeding "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," 28 U.S.C. § 2254(d)(1), or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *id.* § 2254(d)(2). In addition, we presume the factual findings of the state court are correct unless petitioner can rebut this presumption by clear and convincing evidence. *See id.* § 2254(e)(1).

*Id.* at 1264-65.

The level of deference owed the OCCA in this case is somewhat complicated. As to factual findings underlying claims which the OCCA decided on the merits and for which the federal district court refused to grant an evidentiary hearing, the dictates of 28 U.S.C. § 2254(e)(1) apply and we must presume them true unless rebutted by Mr. Smith by clear and convincing evidence. As to factual findings underlying claims for which the federal district court properly granted an evidentiary hearing and for which the OCCA made no factual findings, we review the district's court findings for clear error. *See Miller v. Champion*, 161 F.3d 1249, 1253 (10th Cir. 1998); *see also Romano v. Gibson*, 278 F.3d 1145, 1150 (10th Cir. 2002).

> [W]here . . . a habeas petitioner has diligently sought to develop the factual basis underlying his habeas petition, but a state court has prevented him from doing so, . . . [he] is entitled to receive an evidentiary hearing so long as his allegations, if true and not contravened by the existing factual record, would entitle him to relief.

*Miller*, 161 F.3d at 1253. The Oklahoma courts refused to grant Mr. Smith's request for an evidentiary hearing on any of the claims in his application for post-conviction relief. The federal district court found that Mr. Smith met the standard for an evidentiary hearing as to his claims of ineffective assistance of counsel. *Smith v. Gibson*, No. CIV-98-601-R, at 3 (W.D. Okla. 2002). We therefore review the federal district court's findings based upon facts adduced at the evidentiary hearing for clear error. *Rogers*, 173 F.3d at 1282.

We will not, however, review Mr. Smith's claims if they were defaulted in state court on independent and adequate state procedural grounds unless Mr. Smith has demonstrated cause and prejudice or a fundamental miscarriage of justice. *See English v. Cody*, 146 F.3d 1257, 1259 (10th Cir. 1998) (citing *Coleman v. Thompson*, 501 U.S. 722, 749-50 (1991)). Independent state procedural grounds are those that rely exclusively on state law as a basis of decision. *Id.* Whether a state procedural default rule is adequate to preclude federal review depends upon how consistently and evenhandedly the state applies the rule. *Id.*

Mr. Smith first raised an ineffective assistance of counsel claim (and a multitude of related sub-claims) in his application for post-conviction relief. In denying relief, the OCCA held that Mr. Smith had procedurally defaulted the claim by failing to raise it on direct appeal. *Smith*, 955 P.2d at 737-40. The federal district court reached the merits of this claim, but did so "based on an overly broad application of the exception to state procedural bar recognized in *Walker v. Attorney General*, 167 F.3d 1339[, 1344-45 (10th Cir. 1999)]."[3] *Cargle*

---

[3]*Walker*, like the case before us today, concerned a federal habeas petitioner who brought his direct appeal prior to the 1995 amendments to Oklahoma's procedural default statute, yet the OCCA applied the amended statute to bar claims omitted on direct appeal. *See Walker v. Att'y Gen.*, 167 F.3d 1339, 1344-45 (10th Cir. 1999). Our rationale in refusing to recognize the procedural bar in *Walker* was that a petitioner "should not be deprived of a claim for failing to comply with a rule that only comes into being after the time for compliance has

(continued...)

-6-

*v. Mullin*, 317 F.3d 1196, 1201 (10th Cir. 2003). In *Cargle*, we addressed

*Walker*'s proper scope and application, particularly with respect to claims of

ineffective assistance of counsel:

> if claims omitted on direct state appeal would have been barred on
> state post-conviction anyway, even under Oklahoma's pre-1995 law
> (for example, if they rested on authority established at the time of
> direct appeal), it would not make sense to isolate the new 1995
> standard as the operative cause of the default. Thus, we have not
> applied *Walker* to excuse petitioner's default in failing to raise
> claims in his direct appeal that were at the time of the default clearly
> established. Here, the *Walker* exception to procedural default is
> inapplicable to . . . petitioner's claim[] . . . [of] ineffective assistance
> of counsel . . . . We will consider whether [that claim] should be
> resolved on the merits notwithstanding state procedural default,
> under the traditional federal standards for evaluating when state
> procedural default should be excused.

*Id.* at 1201-02 (footnote omitted).

Although the district court wrongly applied *Walker* to excuse Mr. Smith's

procedural default, Mr. Smith's ineffective assistance of counsel claims are

properly before this court under the traditional federal standards for evaluating

when a state procedural bar should be excused. "Because the effective assistance

---

[3](...continued)
passed." *Walker*, 167 F.3d at 1345; *see also Mitchell v. Gibson*, 262 F.3d 1036,
1047 (10th Cir. 2001). The issues at stake in *Walker* were the 1995 amendment's
strict limits on claims based on intervening changes in law and that new rule's
application to a claim based on the Supreme Court's invalidation of Oklahoma's
clear-and-convincing evidence standard for trial competency. *Walker*, 167 F.3d at
1345. *Walker* thus governs claims based on changes in law which would have
sufficed to excuse default under the statutory scheme in effect when the
procedural omission occurred, but which are barred by application of the new
procedural statute.

of counsel lies at the very foundation of the adversary system of criminal justice, this court has been particularly vigilant in scrutinizing the adequacy of state rules of procedural default which have the effect of barring federal habeas review." *English*, 146 F.3d at 1259. We have repeatedly noted the "healthy degree of skepticism" with which we view such procedural bars. *See Anderson v. Att'y Gen.*, 342 F.3d 1140, 1143 (10th Cir. 2003); *Beavers v. Saffle*, 216 F.3d 918, 923 (10th Cir. 2000); *Smallwood*, 191 F.3d at 1268. In *English*, we determined that Oklahoma's procedural rules would serve to preclude habeas review of ineffective assistance claims *only* when "trial and appellate counsel differ" *and* the "claim can be resolved upon the trial record alone." *English*, 146 F.3d at 1264.

Extra-record facts are central to the vast majority of ineffective assistance of counsel claims, and the case before us is typical in that regard. While the court appointed Mr. Smith new counsel on direct appeal, key facts underlying his claims as to trial counsel's insufficient investigation and deficient performance lay outside the trial record. In analogous cases, we have held Oklahoma's procedural rules inadequate to bar review. *See Sallahdin v. Gibson*, 275 F.3d 1211, 1235 (10th Cir. 2002) (failure to raise ineffective assistance on direct appeal not adequate bar to federal review where trial counsel's reasons for failing to present mental health testimony and other evidence not in trial record); *Romano*, 239 F.3d at 1180 (same where extent of trial counsel's preparation and

additional evidence counsel should have discovered not in trial record).

We recognized in *English* that new statutory rules enacted by Oklahoma in 1995 to govern capital cases permitted the OCCA to remand a *direct appeal* for an evidentiary hearing on ineffective assistance where the claim "requires factfinding outside the direct appeal record." *English*, 146 F.3d at 1263 n.6 (quoting OKLA. STAT. tit. 22, § 1089(D)(4)(b)(1)). We went on to note, however, that the OCCA had narrowly construed this statute to allow remand only if the relevant evidence was not available to the defendant's attorney at the time of appeal. *Id.* In subsequent capital cases, we have placed the burden on the State of Oklahoma to show that this procedural mechanism has been consistently and evenhandedly applied and is thereby adequate to bar our review. *See Cannon v. Gibson*, 259 F.3d 1253, 1272 n.20 (10th Cir. 2001) (citing *Hooks v. Ward*, 184 F.3d 1206, 1217 (10th Cir. 1999)). The state has made no such showing in this case. Consequently, Mr. Smith's claims of ineffective assistance of counsel are not procedurally barred. We therefore review the district court's legal determinations regarding this claim *de novo* and its factual determinations for clear error. *Cannon*, 259 F.3d at 1260; *LaFevers v. Gibson*, 182 F.3d 705, 711 (10th Cir. 1999).

### III.

### GUILT STAGE

As errors in the guilt stage of his trial, Mr. Smith cites prosecutorial misconduct and ineffective assistance of counsel. We address each argument in turn.

Mr. Smith contends the prosecutors in his case "embarked on an improper course . . . of innuendo and misrepresentation of the record," entitling him to relief on grounds of prosecutorial misconduct. Aplt. Br. at 88. Mr. Smith brought this claim on direct appeal, but the OCCA did not address the various instances of alleged prosecutorial misconduct individually, and it is difficult to discern from its opinion which allegations received merits review and which did not. *See Smith*, 932 P.2d at 532. Mr. Smith then raised another set of misconduct allegations in his application for post-conviction relief, but the OCCA held them procedurally barred. *See Smith*, 955 P.2d at 737. We need not determine the level of deference owed the OCCA's conclusions as to these various misconduct claims or which are barred on independent and adequate state grounds. Where an issue "may be more easily and succinctly affirmed on the merits," judicial economy counsels in favor of such a disposition. *Miller v. Mullin*, 354 F.3d 1288, 1297 (10th Cir. 2004) (quoting *Romero v. Furlong*, 215 F.3d 1107, 1111 (10th Cir. 2000)).

As instances of prosecutorial misconduct, Mr. Smith cites the prosecutors' (1) attacks on defense expert witnesses, (2) appeals to passion and prejudice, (3) improper revelation to the jury that Mr. Smith invoked his right to counsel, (4) recitation of facts not in evidence calculated to inflame the jury, (5) name-calling, (6) statements of personal opinion and sense of justice, (7) misstatement of the date of death, (8) assertion of a false motive, and (9) reference to photographs ruled inadmissible in the penalty phase of trial. When claims such as these are brought in a petition for a writ of habeas corpus, we review them only for a violation of due process. *See Darden v. Wainwright*, 477 U.S. 168, 181 (1986). "[N]ot every trial error or infirmity which might call for application of supervisory powers correspondingly constitutes a failure to observe that fundamental fairness essential to the very concept of justice." *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974) (citations and quotations omitted). For us to grant Mr. Smith relief on these claims, we must find that the prosecutors' remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* at 643. This determination may be made only after "tak[ing] notice of all the surrounding circumstances, including the strength of the state's case." *Coleman v. Brown*, 802 F.2d 1227, 1237 (10th Cir. 1986). Having thoroughly reviewed the record of Mr. Smith's trial, we find many improper statements but none that resulted in a denial of due process.

Mr. Smith contends his claim that prosecutors improperly revealed his invocation of the right to counsel demands more exacting review than what is envisioned by *Donnelly*. In *Donnelly*, the Supreme Court excepted from its fundamental-fairness analysis "prosecutor's remarks [which] so prejudiced a specific right . . . as to amount to a denial of that right." *Donnelly*, 416 U.S. at 643. Thus, if prosecutorial misconduct sufficiently impacts a specific right, we apply the constitutional standard applicable to that right. We found such a denial in *Mahorney v. Wallman*, 917 F.2d 469 (10th Cir. 1990). The specific right at issue there was the presumption of innocence, which we ruled the prosecutor effectively denied when he made the following argument to the jury:

> I submit to you, under the law and the evidence, that we are in a little different position today than we were when we first started this trial and it was your duty at that time, under the law of this land, as you were being selected as jurors, to actively in your minds presume that man over there not to be guilty of the offense of rape in the first degree, but, you know, things have changed since that time. I submit to you at this time, under the law and under the evidence, that that presumption has been removed, that that presumption no longer exists, that that presumption has been removed by evidence and that he is standing before you now guilty. That presumption is not here any more.

*Id.* at 471. In *Mahorney*, defense counsel "vigorously objected" to this patently erroneous statement about the constitutionally protected presumption of innocence. *Id.* at 473. The trial court failed to minimize the effect of the statement through admonishment or special instructions to the jury. *Id.*

The facts surrounding revelation of Mr. Smith's invocation of the right to counsel are substantially less invasive of that right than was the case in *Mahorney*. At Mr. Smith's trial, the State introduced a videotape of Mr. Smith's interaction with police officers shortly after he was placed in custody. At the end of the tape, Mr. Smith displayed his attorney's business card and said, "There's a guy who came to see me yesterday." St. Ex. 124. When the officers confirmed that Kenneth Watson, the attorney, did indeed represent Mr. Smith, they ended the interview. *Id.* After the jury viewed this portion of the video, Mr. Watson moved for a mistrial. The court denied the motion, but admonished the jury to disregard anything it had viewed past the point where Mr. Smith removed Mr. Watson's card because what appeared on the screen after that point did "not tend to prove or disprove any issue that we're here for you to determine." Tr., vol. V, at 77-78, 80. This scenario did not so prejudice Mr. Smith's right to counsel as to amount to a violation of that right. It is thus subject to fundamental-fairness analysis. Applying that analysis, we hold that Mr. Smith's trial was not "so infected . . . with unfairness as to make the resulting conviction a denial of due process," *Donnelly*, 416 U.S. at 643, and he is therefore not entitled to relief on this claim.

Mr. Smith also contends his trial counsel, Mr. Watson, was constitutionally ineffective at the guilt phase of his trial. Specifically, he points to the following deficiencies on Mr. Watson's part: (1) failure to investigate, develop, and present

evidence establishing Mr. Smith's incompetence to stand trial; (2) failure to challenge Mr. Smith's confessions with available legal arguments and to present evidence showing Mr. Smith's waiver of rights was not knowing and intelligent and his confession was not voluntary; (3) failure to investigate, develop, and present available evidence refuting the State's theory of motive; (4) failure to understand the mental health evidence at issue in Mr. Smith's trial and the incoherent and haphazard manner in which it was presented; and finally, (5) failure to investigate, develop, and present an insanity defense. The State argues Mr. Watson's performance was constitutionally sufficient, and even if it was not, Mr. Smith cannot show he was prejudiced by Mr. Watson's ineffectiveness.

The general principles governing an ineffective assistance of counsel claim are set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). Because the OCCA never reached the merits of Mr. Smith's ineffective assistance of counsel claim, we review *de novo* the district court's legal determinations regarding this issue and its factual determinations for clear error. *Romano*, 278 F.3d at 1150; *LaFevers*, 182 F.3d at 711. The district court concluded that Mr. Watson's guilt phase performance did not fall below constitutional requirements. *Smith*, No. CIV-98-601-R, at 19. While Mr. Watson's performance at the guilt stage gives us pause, we are not convinced Mr. Smith was prejudiced thereby.

The gravity of a claim of ineffective assistance of counsel cannot be

-14-

overstated. "Of all the rights that an accused person has, the ability to be represented by counsel is by far the most pervasive, for it affects his ability to assert any other rights he may have." *Kimmelman v. Morrison*, 477 U.S. 365, 377 (1986) (quoting Walter V. Schaefer, *Federalism & State Criminal Procedure*, 70 HARV. L. REV. 1, 8 (1956)). The Supreme Court's *Strickland* decision "established the legal principles that govern claims of ineffective assistance of counsel." *Wiggins v. Smith*, 123 S. Ct. 2527, 2535 (2003). In order to prevail on this claim, Mr. Smith must demonstrate both that Mr. Watson's performance was deficient and that Mr. Watson's deficiencies prejudiced Mr. Smith's defense. *Strickland*, 466 U.S. at 687. Our review of counsel's effectiveness is "highly deferential." *Id.* at 689. In assessing Mr. Watson's performance, we "consider all the circumstances, making every effort to 'eliminate the distorting effects of hindsight,'" and view his "'conduct from [his] perspective at the time.'" *Hooper v. Mullin*, 314 F.3d 1162, 1169 (10th Cir. 2002) (quoting *Strickland*, 466 U.S. at 689). By the same token, we must eschew *post hoc* rationalizations for Mr. Watson's deliberations, investigations, and defense strategy, or lack thereof. *See Wiggins*, 123 S. Ct. at 2538.

Mr. Smith calls our attention to various failings in Mr. Watson's performance at the first stage of Mr. Smith's murder trial. Many of these deficiencies are troubling. *Strickland*, however, requires a showing of both

deficient performance and prejudice. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Strickland*, 466 U.S. at 697. We take that course with regard to counsel's guilt stage assistance.

First, Mr. Smith claims Mr. Watson was ineffective in failing to investigate and assert Mr. Smith's incompetence after the initial competency hearing. The mandate barring trial of the incompetent dates to the days of Blackstone and is "fundamental to an adversary system of justice." *Drope v. Missouri*, 420 U.S. 162, 171-72 (1975). The Supreme Court has insisted that "a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to trial." *Id*. at 171.

A claim of incompetency raises "issues of both substantive and procedural due process." *Walker*, 167 F.3d at 1343. A procedural competency claim arises from "a trial court's alleged failure to hold a competency hearing, or an adequate competency hearing." *McGregor v. Gibson*, 248 F.3d 946, 952 (10th Cir. 2001). "[A] substantive competency claim is founded on the allegation that an individual was tried and convicted while, in fact, incompetent." *Id.* Mr. Smith asserts Mr. Watson's shortcomings led to violation of both his procedural and substantive rights.

A court's "failure to observe procedures adequate to protect a defendant's right not to be tried or convicted while incompetent to stand trial deprives him of his due process right to a fair trial." *Drope*, 420 U.S. at 172. The trial court in Mr. Smith's case held a competency hearing pre-trial, but it held Mr. Smith to a clear-and-convincing-evidence standard of proof of his incompetence. *See Smith*, 932 P.2d at 527. In *Cooper v. Oklahoma*, 517 U.S. 348 (1996), the Supreme Court declared this standard unconstitutional. On direct appeal, the OCCA acknowledged the Supreme Court's holding in *Cooper*, but held Mr. Smith had not proven his incompetence even by the constitutional preponderance of the evidence standard. *Smith*, 932 P.2d at 528. We agree.

In *McGregor*, we set forth the standard governing procedural competency claims under the circumstances presented in this case:

> [T]o prevail on a procedural competency claim after a trial in which a petitioner was found competent under an unconstitutional burden of proof, the petitioner must establish that a reasonable judge should have had a bona fide doubt as to his competence at the time of trial. We view the evidence in the record objectively, from the standpoint of a reasonable judge presiding over petitioner's case at the time of trial. A petitioner establishes a bona fide doubt if he shows that a reasonable judge should have doubted whether petitioner had "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and whether petitioner had "a rational as well as factual understanding of the proceedings against him." [*Dusky v. United States*, 362 U.S. 402, 402 (1960).] We stress that the due process requirement is continuing; a defendant must be competent throughout the entire trial. *See Drope*, 420 U.S. at 171-72.

-17-

*McGregor*, 248 F.3d at 954.

We emphasized in *McGregor* that a person making a procedural incompetence claim "need not establish facts sufficient to show he was actually incompetent or to show he was incompetent by a preponderance of the evidence." *Id.* Rather, we look to "evidence of . . . irrational behavior, . . . demeanor at trial, and any prior medical opinion" to determine whether further inquiry on the part of the trial judge was required. *Id.* (quoting *Drope*, 420 U.S. at 180). "[E]vidence of mental illness and any representations of defense counsel about the defendant's incompetence" would also be significant. *Id.* (quoting *Walker v. Gibson*, 228 F.3d 1217, 1227 (10th Cir. 2000)). "We examine the totality of the circumstances . . . . The question is . . . whether the trial court 'fail[ed] to give proper weight to the information suggesting incompetence which came to light during trial.'" *Id.* at 955 (quoting *Drope*, 420 U.S. at 179).

The evidence of Mr. Smith's competence encountered by the trial court was mixed. Before trial, Mr. Smith's attorney moved for a determination of competency, stating that Mr. Smith was "unable to comprehend his attorney or to meaningfully assist in the defense of his case," and that his "mental state and communication abilities are such that they seriously interfere with the understanding of proceedings against him and with his capability of aiding his attorney in preparation for this trial." O.R., vol. I, at 24. In response to this

-18-

motion, the trial judge ordered a competency evaluation. *Id.* at 25. Dr. Edith King, a psychologist, performed the evaluation, interviewing Mr. Smith three times and speaking with his mother. *Id.* at 28-31. Although she recommended Mr. Smith receive a neurological examination, she concluded he was competent to stand trial. *Id.* at 31. At a post-examination hearing on competency, Mr. Watson submitted only Dr. King's report and the court found Mr. Smith competent to stand trial. The court made clear, however, that he would entertain further evidence of incompetence at any time. Motion Tr., Sept. 3, 1993, at 5. While Mr. Watson never again formally challenged Mr. Smith's competency in court, he "t[ook] issue with" Dr. King's finding of competence when he moved for access to the resources of the public defender's office, O.R., vol. I, at 44-46. He also requested funds for further medical investigation into Mr. Smith's competency, O.R., vol. II, at 218, 329; funds for a SPECT scan, an MRI, and an EEG, O.R., vol. II, at 301; and a continuance so he could seek a more adequate examination of Mr. Smith's competence, O.R., vol. II, at 320.

Mr. Watson testified at the evidentiary hearing that Mr. Smith was withdrawn in their conversations and unhelpful in obtaining information about the murders and any possible defense. E.H., vol. VIII, at 13-14. In Mr. Watson's assessment, Mr. Smith earnestly believed a fanciful story about a DEA agent's having killed his family. *Id.* at 19. Gary Ray, a former employee of the

Oklahoma County jail, encountered Mr. Smith talking to himself in his cell and described Mr. Smith as "a few french fries short of a Happy Meal." *Id.* at 142. Joseph Ward, a mitigation investigator, testified as to both Mr. Smith's withdrawn and then his hypervigilant or hyperactive behavior. *Id.* at 244. Mr. Ward wrote a memo to Mr. Watson's attention raising the issue of Mr. Smith's competence to stand trial and his ability to waive constitutional rights during police interrogation. E.H., vol. III, at 30-31.

Both of Mr. Smith's medical experts, Dr. John Smith, a clinical psychiatrist, and Dr. Philip Murphy, a neuropsychologist, testified to Mr. Smith's severe mental impairments, but they also found him competent to stand trial. Tr., vol. VIII, at 46, 91.[4] At the evidentiary hearing, Dr. Alan Hopewell testified that Mr. Smith's mental capacity was similar to that of a twelve-year-old, but he agreed that twelve-year-olds know right from wrong and can understand criminal charges on a basic level. E.H., vol. X, at 417-18, 429.

There is no record of Mr. Smith exhibiting bizarre behavior before the trial court. The court's most extended interaction with Mr. Smith took place when he presented several *pro se* motions. Taking into account the evidence gathered in

---

[4]Dr. John Smith's evidentiary hearing protestations that he would have found Mr. Smith incompetent had Mr. Watson provided him with more information relating to Mr. Smith's mental state prior to trial drew skepticism from the district court and is less than persuasive in view of the evidence he had available at the time of trial. *See Smith v. State*, No. CIV-601-R, at 37-38, 58 (W.D. Okla. 2002).

federal district court, it seems quite clear that Mr. Smith did not write these motions; they were composed by "jailhouse lawyer" Ronald Veatch. *See* Rec., vol. III, at docs. 10-12, 32, 35. But Mr. Smith orally presented the motions. While Mr. Smith's presentation did not reveal the skills of a trained legal mind, he put forth a coherent argument and demonstrated comprehension of both a lawyer's duties and the concept of a "fair trial." Tr., vol. II, at 3-6; Tr., vol. IV, at 197-202. Based on the totality of these circumstances, we are not persuaded the trial court should have had a bona fide doubt regarding Mr. Smith's competence. Consequently, Mr. Smith cannot show prejudice resulting from any deficiencies in Mr. Watson's performance with respect to his procedural incompetency claim.

In order to state a valid substantive due process competency claim, Mr. Smith must show "he was, in fact, tried and convicted while mentally incompetent." *Walker*, 228 F.3d at 1229. The burden of proof on a substantive claim of incompetency is higher than that on a procedural claim. "To prevail," Mr. Smith "must demonstrate by clear and convincing evidence a real, substantial, and legitimate doubt regarding his competence to stand trial." *Id*. Given that the evidence fails to satisfy the bona fide doubt standard, it necessarily "also does not satisfy the more demanding standard for a substantive claim." *Walker*, 167 F.3d at 1347. Therefore, any deficiencies in Mr. Watson's performance were non-

prejudicial.[5]

Next, Mr. Smith challenges Mr. Watson's performance in failing to prevent introduction of his confession. Twice Mr. Smith gave incriminating statements to police detectives. Mr. Smith claims that the waiver of rights preceding each confession was invalid, and that Mr. Watson should have been more vigilant in keeping the confession out of his state court trial.

In order to be effective, a waiver must be made "voluntarily, knowingly, and intelligently." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). The Supreme Court has held that a court's inquiry into a waiver's validity "has two distinct dimensions":

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

---

[5]Mr. Smith raised procedural and substantive competency claims on direct appeal independent of his subsequent ineffective assistance claim. The OCCA denied relief on the merits. *Smith v. State*, 932 P.2d 521, 528 (Okla. Crim. App. 1996). He raises these claims again in this court. Because Mr. Smith received a competency hearing during the state court trial, he was not entitled to a federal evidentiary hearing on this independent claim apart from his assertion that his counsel was ineffective in presenting it. But for our consideration of the competency claim as part of Mr. Smith's ineffective assistance of counsel claim, the OCCA's determination of the claim would have been entitled to AEDPA deference. 28 U.S.C. § 2254(d)(1).

*Moran v. Burbine*, 475 U.S. 412, 421 (1986) (citations and quotations omitted).

For a waiver to be knowing and intelligent, it "must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." *United States v. Morris*, 287 F.3d 985, 989 (10th Cir. 2002) (quoting *Colorado v. Spring*, 479 U.S. 564, 573 (1987)). "No doubt a defendant's mental capacity . . . is relevant to whether or not" he or she is capable of such a waiver. *Id.*

As evidence that he did not knowingly and intelligently waive his rights, Mr. Smith cites his mental retardation, mental illness, and the police detectives' "intentional and calculated misrepresentation[s]." Aplt. Br. at 80. Mr. Smith's cognitive difficulties are apparent. Each doctor who examined him placed his intellectual functioning in the range of mild to borderline mental retardation. Tr., vol. VIII, at 15; E.H., vol. X, at 448; E.H., vol. XI, at 675, 693; E.H., vol. XII, at 740. Dr. Hopewell, a clinical neuropsychologist, testified that Mr. Smith's comprehension is similar to that of a twelve-year-old's. E.H., vol. X, at 403. Mr. Smith suffers from brain damage as a result of a near-drowning as a child, and that injury affects his cognitive abilities. *Id.* at 374-75. After administering a "Grisso test," which is designed to test one's ability to waive *Miranda* rights, Dr.

Hopewell concluded Mr. Smith could make no such waiver. E.H., vol. X, at 399.[6]

Mr. Smith alleges police detectives questioned him improperly, exacerbating the problems presented by his mental impairments. Prior to each confession, police detectives went over each *Miranda* right and Mr. Smith stated he "believed" he understood each right. St. Exs. 94, 124. The detectives began their interviews, however, not with discussion of the murders but with questions regarding a car accident Mr. Smith reported and the head injury he may have suffered as a result. *Id.* Mr. Smith describes this questioning as the sort of "trickery" that "can vitiate the validity of a waiver." Aplt. Br. 80.

We disagree. The totality of the circumstances support the conclusion that Mr. Smith did in fact make a knowing and intelligent waiver of his *Miranda* rights. First, while Mr. Smith's intellectual functioning was limited, Dr. Hopewell testified he would understand the role of police officers and the concept of a criminal charge. E.H., vol. X, at 430-31. Second, the "Grisso test" Dr. Hopewell administered took place years after Mr. Smith's interrogation and the

---

[6]In addition, Dr. Smith diagnosed Mr. Smith with dissociative identity disorder (DID), more commonly known as "multiple personality disorder." E.H., vol. IX, at 328. Dr. Hopewell concurred in this diagnosis, although tentatively. E.H., vol. X, at 425-26. The federal district court, after having heard testimony from Drs. Smith and Hopewell, as well as from the State's experts, doubted this new diagnosis. *See Smith*, No. CIV-98-601-R, at 37-38. That court was in a much better position to evaluate the relative strength of expert testimony, and we defer to its conclusions. *See Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985) (citations omitted); *Gonzales v. Thomas*, 99 F.3d 978, 985 (10th Cir. 1996).

deterioration of his condition in jail could have affected the results. Additionally, while Mr. Smith's cognitive abilities may have mirrored those of a twelve-year-old, *id.* at 403, this fact alone does not render his waiver ineffective. *See Fare v. Michael C.*, 442 U.S. 707, 725 (1979) (totality-of-the-circumstances approach determines validity of even a juvenile's waiver). The videotapes of Mr. Smith's confessions reveal that, while his memory was not wholly intact and his responses to answers came slowly, he stated his understanding of the *Miranda* rights, he comprehended the questions the officers presented, and he provided an accurate description of the crimes and crime scene. St. Exs. 94, 124. Significantly, Mr. Smith had prior experience with the criminal justice system. In 1986, he retained counsel to defend him on an assault charge, eventually pled guilty, and served time in prison. The concepts encompassed by *Miranda* were not foreign to him.

The detectives' queries about Mr. Smith's car accident and head injury do not change the calculus. Contrary to Mr. Smith's characterization, these questions did not represent an "affirmative misrepresentation." The officers were interested in Mr. Smith's whereabouts and activities in the days immediately preceding the interview. They were also curious as to whether the accident occurred before or after Mr. Smith committed the crimes. "The Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege." *Spring*, 479 U.S. at

574. Nor does it require that police interrogations commence immediately with the subject matter of the crime. The relevant inquiry is whether the suspect understands the rights at stake and the consequences of waiving them. *Id.* at 574-75. Regardless of the level of preparedness and vigilance Mr. Watson demonstrated concerning Mr. Smith's "knowing and intelligent" confession, Mr. Smith cannot show he was prejudiced by his attorney's performance.

Mr. Smith marshals the same evidence as proof that his waiver and subsequent confession were involuntary and therefore Mr. Watson should have sought more actively to have the court suppress them. The constitutional question posed by such a claim is "whether a defendant's will was overborne by the circumstances surrounding the giving of a confession." *Dickerson v. United States*, 530 U.S. 428, 434 (2000) (quotation omitted). The Supreme Court has held "coercive police activity" to be "a necessary predicate to the finding that a confession is not 'voluntary.'" *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). We assess voluntariness of a suspect's waiver of his *Miranda* rights by examining the totality of the circumstances. *See United States v. Nguyen*, 155 F.3d 1219, 1222 (10th Cir. 1998).

Factors relevant to determining voluntariness of a suspect's waiver include his "age, intelligence, and education, and the details of the interrogation, such as whether the suspect was informed of his rights, the length of the detention and the

interrogation, and the use or threat of physical force." *Id.* Although Mr. Smith was an adult at the time of interrogation, his cognitive abilities were similar to those of a twelve-year-old, E.H., vol. X, at 403, his intellectual functioning was quite low, Tr., vol. VIII, at 15; E.H., vol. X, at 448; E.H., vol. XI, at 675, 693-94; E.H., vol. XII, at 740, and his education was minimal, E.H., vol. XI, at 572. But in response to Mr. Smith's hesitant responses to questioning, the detectives in both interrogations went over each of the *Miranda* rights slowly and repeatedly, and Mr. Smith eventually reported he understood them. St. Exs. 94, 124. The police questioning was fairly gentle, and the interviews were relatively brief. *Id.* And despite Mr. Smith's contentions, the questioning did not include "affirmative misrepresentation."

Mr. Smith's mental impairments are nonetheless relevant to our scrutiny of his interrogation because they enhance his "susceptibility to police coercion." *Connelly*, 479 U.S. at 165. Police may not "exploit[] this weakness with coercive tactics." *Id.* Our examination of the record reveals that the tactics used by police in this case did not overbear Mr. Smith's will. Taking into account the care with which officers must question a person of Mr. Smith's abilities, we see no overreaching. Any lack of effort at suppression on Mr. Watson's part is irrelevant; the confessions were constitutionally admissible. Because Mr. Smith has not established a constitutional violation, he cannot show he was prejudiced

by Mr. Watson's performance in this regard.[7]

Finally, Mr. Smith assails Mr. Watson's performance in challenging the state's theory of motive, presenting mental health evidence, and failing to raise an insanity defense. Having carefully reviewed the record, we see no prejudice. At the evidentiary hearing in federal district court, counsel for Mr. Smith described the evidence of Mr. Smith's guilt as "overwhelming." E.H., vol. X, at 477. The state's theory of motive—that Mr. Smith may have murdered his wife and stepchildren to collect on their life insurance—was but a small part of this "overwhelming" evidence, and we are convinced a successful challenge thereto would have had no effect on the jury's finding of guilt. The quantity and quality of the evidence of Mr. Smith's mental illness and retardation, as well as counsel's skill in presentation of this evidence, differed significantly at trial and at the evidentiary hearing in federal district court. Nevertheless, the district court was unconvinced by Dr. Smith's new diagnosis of DID, *see Smith*, No. CIV-98-601-R, at 34, and we must defer to this credibility determination. *See Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985) (citations omitted); *Gonzales v. Thomas*,

---

[7]As with his incompetency claim, Mr. Smith challenges his confession independently of his ineffective assistance claim. The state trial court held a hearing pursuant to *Jackson v. Denno*, 378 U.S. 368, 378 (1964), *see* Tr., vol. III, at 181-215, and the OCCA rejected this claim on the merits. *See Smith*, 932 P.2d at 530. But for the ineffective assistance of counsel claim, our review of the independent claim would have been narrowed by AEDPA, 28 U.S.C. § 2254(d)(1), and limited to the facts available to the state courts.

99 F.3d 978, 985 (10th Cir. 1996).  Oklahoma follows the demanding rule of *M'Naghten's Case*, 8 Eng. Rep. 718 (1843), determining insanity by putting to the jury the ultimate question of whether a defendant was capable of knowing right from wrong at the time of the offense.  *Jacobson v. State*, 684 P.2d 556, 561 (Okla. Crim. App. 1984).  Even on the evidence available to Mr. Watson, should he have obtained and presented it, an acquittal was highly unlikely.

Mr. Smith has not shown "there is a reasonable probability that, but for counsel's unprofessional errors," the jury would have acquitted Mr. Smith of the crimes for which he stood accused.  *Strickland*, 466 U.S. at 694.  Consequently, he was not prejudiced by any deficiencies in his counsel's performance during the guilt phase of his trial.[8]

## IV.

### SENTENCING

As errors in the sentencing stage of his trial, Mr. Smith cites (1) faulty jury instructions on mitigation and life without parole and (2) ineffective assistance of counsel.  His claims as to the court's instructions have no merit, but Mr. Smith is entitled to relief on his ineffective assistance claim.

---

[8]Mr. Smith posits the cumulative effect of errors in this case justify relief from his conviction.  "[C]umulative-error analysis aggregates only actual errors to determine their cumulative effect."  *United States v. Rivera*, 900 F.2d 1462, 1470 (10th Cir. 1990).  Because we have found no error with respect to Mr. Smith's conviction, there is "no error to cumulate, and no occasion to apply a cumulative-error analysis."  *Id.* at 1472.

The court gave two mitigation instructions to the jury at the sentencing phase of the trial. Mr. Smith contends there is a reasonable likelihood the jury applied these instructions in such a way as to preclude consideration of his mental impairments, in violation of the Eighth and Fourteenth Amendments. The OCCA disagreed, *Smith*, 932 P.2d at 534, so we cannot grant relief unless that court's conclusion is contrary to or an unreasonable application of federal law. 28 U.S.C. § 2254(d)(1). The instructions about which Mr. Smith complains read as follows:

> **Instruction Number 9, Determination of Mitigating Circumstances:**
> Mitigating circumstances are those which, in fairness and mercy, may be considered as extenuating or reducing the degree of moral culpability or blame. The determination of what are mitigating circumstances is for you as jurors to resolve under the facts and circumstances of this case.
>
> **Instruction Number 10, Circumstances Which May Be Mitigating:**
> Evidence has been offered as to the following mitigating circumstances:
>
> 1. Defendant surrendered himself to the Oklahoma City Police Department;
> 2. Defendant informed the Police Detectives of the killings and their details;
> 3. Defendant exhibited remorse;
> 4. Neither of the female children suffered stab wounds;
> 5. The Defendant did not attempt to flee the jurisdiction of the State.
> 6. The life of Roderick Smith has value to his friends and family.
>
> Whether these circumstances existed, and whether these circumstances are mitigating, must be decided by you.

O.R., vol. III, at 478-79.

-30-

Mr. Smith likens these instructions to those held unconstitutional by the Supreme Court in *Penry v. Johnson*, 532 U.S. 782 (2001) (*Penry II*). There, the court instructed the jury it was to arrive at a sentence by answering three "special issues": "whether Penry acted deliberately when he killed Pamela Carpenter, whether there was a probability that Penry would be dangerous in the future, and whether Penry acted unreasonably in response to provocation." *Id.* at 788-89. The court then gave a supplemental instruction, directing the jury: "If you determine, when giving effect to the mitigating evidence, . . . that a life sentence . . . is an appropriate response to the personal culpability of the defendant, a negative finding should be given to one of the special issues." *Id.* at 790. The Supreme Court held these instructions unconstitutional because there was "at the very least, a reasonable likelihood that the jury . . . applied [them so as to] prevent consideration of Penry's mental retardation and childhood abuse." *Id.* at 800 (citations, quotations, and alterations omitted). The problem with the quoted instructions, the Court held, was that "it would have been both logically and ethically impossible for a juror to follow both sets of instructions." *Id.* at 799. Because neither mental retardation nor childhood abuse "fit within the scope of the special issues, answering those issues in the manner prescribed on the verdict form necessarily meant ignoring the command of the supplemental instruction." *Id.*

The trial court presented no such logical conundrum to the jury in Mr. Smith's case. Instruction Nine broadly defined mitigation, and Mr. Smith's mental impairments easily fit within it. The issue raised here is almost indistinguishable from that in *Cooks v. Ward*, 165 F.3d 1283 (10th Cir. 1998), a case in which we denied relief. The trial court in *Cooks* gave a general mitigation instruction identical to Instruction Nine, then an additional instruction listing particular mitigating factors presented by counsel. *Id.* at 1291-92. We "fail[ed] to see how the specificity [of the second instruction] in any way undermined the general directives of [the first instruction]." *Id.* at 1292. We went on to note that "Mr. Cooks' concerns with [the court's instructions] appear to stem not so much from the instructions themselves . . . , but from his own attorney's failure to present mitigating evidence on his behalf, or to offer any alternative or supplemental instructions." *Id.* Likewise, blame for the lack of mitigation evidence before the jury in Mr. Smith's case lies with counsel, not the trial court.[9] These instructions, materially similar to those in *Cooks*,[10] did not preclude

_____

[9]We discuss trial counsel's performance with respect to sentencing at length below.

[10]It is true that the wording of the more specific instruction in *Cooks* was slightly different than that given by the trial court in Mr. Smith's case. The *Cooks* instruction read "Minimum Mitigating Circumstances," while the instruction in Mr. Smith's case read merely "Mitigating Circumstances." The general instructions in both cases, however, were identically expansive. We do not believe the omission of the word "minimum" in Mr. Smith's case precluded

(continued...)

consideration of mitigation evidence. Thus we cannot conclude the OCCA's determination of this claim constituted a decision contrary to federal law or an unreasonable application thereof.

Mr. Smith also challenges the lack of jury instructions regarding the possibility of a sentence of life without parole. In the penalty phase of his trial, the first instruction the jury received stated pursuant to Oklahoma law that each person convicted of first-degree murder "shall be punished by either life imprisonment, life imprisonment without the possibility of parole, or death." O.R., vol. III, at 470. The court did not further define "life imprisonment" or "life imprisonment without the possibility of parole." Mr. Smith alleges this lack of instruction was unconstitutional under the Supreme Court's decisions in *Simmons v. South Carolina*, 512 U.S. 154 (1994), and *Shafer v. South Carolina*, 532 U.S. 36 (2001).

Raising this claim for the first time in state post-conviction proceedings, Mr. Smith sought to defeat the State's asserted procedural bar with a claim of ineffective assistance of counsel at trial and on direct appeal. *Smith*, 955 P.2d at 739. The OCCA held the claim procedurally barred and refused to consider its merits. *Id.* Mr. Smith reasserts ineffective assistance of counsel as a means

_____

[10](...continued)
the jury's consideration of his mental impairments. The jury's failure to consider that evidence arose from trial counsel's failure to present it.

around the state procedural bar, but we need not consider counsel's ineffectiveness concerning the instruction because we may more easily dispose of the claim on the merits. *See Miller*, 354 F.3d at 1297.

In *Simmons*, the Supreme Court held that:

> where a capital defendant's future dangerousness is at issue, and the only sentencing alternative to death available to the jury is life imprisonment without the possibility or parole, due process entitles the defendant "to inform the jury of [his] parole ineligibility, either by jury instruction or in arguments by counsel."

*Shafer*, 532 U.S. at 39 (quoting *Ramdass v. Angelone*, 530 U.S. 156, 165 (2000) (describing *Simmons'* premise and plurality opinion)). We previously addressed an argument identical to Mr. Smith's in *Mayes v. Gibson*, 210 F.3d 1284 (10th Cir. 2000), where we held *Simmons* to be inapposite. *Id.* at 1294. In *Simmons*, the jury "was given a choice between life in prison and death, which, because the jury might have thought the defendant could be released on parole, 'creat[ed] a false choice between sentencing petitioner to death and sentencing him to a limited period of incarceration.'" *Id.* The court in Mr. Mayes' case, like the court in Mr. Smith's, instructed the jury to choose between life imprisonment, life imprisonment without the possibility of parole, and death. *Id.* We concluded the "three-way choice fulfills the *Simmons* requirement that a jury be notified if the defendant is parole ineligible," and denied relief. *Id.*

Mr. Smith believes the Supreme Court's subsequent opinion in *Shafer*

-34-

undermines our holding in *Mayes*. *Shafer* concerned a post-*Simmons* South Carolina statute under which, if the jury found a single statutory aggravator, only two sentencing options remained: death or life imprisonment without the possibility of parole. *Shafer*, 532 U.S. at 41. Mr. Shafer's counsel sought either an instruction on parole ineligibility or permission to inform the jury of that ineligibility in closing argument, but the court denied those requests. *Id.* at 42. Several hours into its deliberations, the jury sent the judge a note asking if there were "any remote chance for someone convicted of murder to become elig[i]ble for parole" and "under what conditions would someone convicted for murder be elig[i]ble." *Id.* at 44. The judge merely instructed the jury that its "consideration [was] restricted to what sentence to recommend," "life imprisonment means until the death of the offender," and "[p]arole eligibility is not for your consideration." *Id.* at 45. The Supreme Court held these circumstances contravened its holding in *Simmons*. *Id.* at 51. In so holding, however, the Court repeatedly emphasized the lack of a third choice in South Carolina's sentencing scheme. *Id.* at 41, 50, 51. Given the two-way choice in *Shafer*, and the clear evidence of jury confusion, that case is distinguishable from our decision in *Mayes*. Because Mr. Smith's case is identical to *Mayes* and suffers none of *Shafer*'s identified short-comings, Mr. Smith is not entitled to relief from his sentence on these grounds.

Finally, and most significantly, Mr. Smith challenges Mr. Watson's assistance to him at sentencing. While the same constitutional principles that guided our examination of Mr. Watson's guilt stage performance apply to his performance at sentencing, we are particularly vigilant in guarding this right when the defendant faces a sentence of death. *See Williamson v. Ward*, 110 F.3d 1508, 1514 (10th Cir. 1997) ("In assessing counsel's conduct, we are mindful of the Supreme Court's observation that '[o]ur duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case.'") (quoting *Burger v. Kemp*, 483 U.S. 776, 785 (1987)). Our heightened attention parallels the heightened demands on counsel in a capital case. *See* ABA Standards for Criminal Justice 4-1.2(c) (3d ed. 1993) ("Since the death penalty differs from other criminal penalties in its finality, defense counsel in a capital case should respond to this difference by making extraordinary efforts on behalf of the accused.").

"The sentencing stage is the most critical phase of a death penalty case. Any competent counsel knows the importance of thoroughly investigating and presenting mitigating evidence." *Romano*, 239 F.3d at 1180. Mr. Smith contends Mr. Watson proved woefully incompetent in this regard. According to Mr. Smith, Mr. Watson failed to understand that Mr. Smith's "borderline mental retardation, mental illness, and organic brain impairment" constituted mitigating evidence to

-36-

be presented at the penalty stage of Mr. Smith's capital trial. We are cognizant of "the overwhelming importance of the role mitigation evidence plays in the just imposition of the death penalty." *Mayes*, 210 F.3d at 1288. The district court concluded Mr. Watson's meager presentation of mitigating evidence fell below the constitutional minimum, *Smith*, No. CIV-98-601-R, at 20, and we agree.

While Mr. Watson was an experienced criminal lawyer, he had never represented a client facing the death penalty prior to his defense of Mr. Smith, had never been involved in death penalty litigation, had never attended any seminars or continuing legal education courses dedicated to capital defense, and had never even handled a case in which psychiatric issues were presented. E.H., vol. VIII, at 10. While Mr. Watson brought in co-counsel "in the days just prior to trial," this case was co-counsel's first capital case as well. *Id.* at 93. Mr. Watson also enlisted the assistance of the state public defender's office. *Id.* at 119. The trial judge approved use of these services after Mr. Watson confessed he "didn't feel competent," that "there was no money" and that the case "deserve[d] more than [he] could give it with [his] limited resources." *Id.* He suggested to the court: "either take me off this case and give it to the public defender's office or give me some other ideas." *Id.* The reason for this suggestion is clear. At the evidentiary hearing in federal district court, Mr. Watson testified: "I mean, I had a caseload that I had to work with. I wasn't

getting any money . . . out of this case. . . . I was over my head at that point. . . . [It was] something that I had never dealt with before." *Id.* at 41. After more than a year on the case—one which generated ten volumes of trial testimony alone—Mr. Smith's mother had paid Mr. Watson "somewhere in the neighborhood of $1,500 to $2,000." *Id.* at 12.

This lack of resources and expertise plus the press of Mr. Watson's other caseload worked to Mr. Smith's detriment. Astoundingly, Mr. Watson admitted at the evidentiary hearing that he was unaware Mr. Smith's "mental state or mental illness could be introduced as mitigation in the second stage" of trial. *Id.* at 48. The record of the sentencing proceeding fully supports this assertion. At sentencing, Mr. Watson called Mr. Smith's family and friends to testify that they loved Mr. Smith and that he was a kind and considerate person. *See* Tr., vol. X, at 33-64. But this testimony encompasses a mere thirty pages out of hundreds in the trial transcript. Mr. Watson made no attempt to explain how this kind and considerate person could commit such a horrendous crime, although mental health evidence providing such an explanation was at his fingertips.

In mitigation, Mr. Watson offered six considerations: (1) "Defendant surrendered himself to the Oklahoma City Police Department," (2) "Defendant informed the Police Detectives of the killings and their details," (3) "Defendant exhibited remorse," (4) "Neither of the female children suffered stab wounds," (5)

"The Defendant did not attempt to flee the jurisdiction of the State," and (6) "The life of Roderick Smith has value to his friends and family." O.R., vol. III, at 479. But he then minimized the value of these circumstances:

> We set out these six mitigating circumstances for your consideration. *We drew on what little we had to draw on*, what little has come, what favorable items have come out of this case that favor Roderick. And we picked six. We picked his family and his friends who can come to you and say, spare his life . . . . *Do for him as he would not do for Jennifer.* . . . That's all we're asking. *And it seems awful small to ask when you've got five victims*, but that's the only thing we've got left. . . .
> What we're saying is that you have to look at *these mitigating factors, however slight they may be*. . . .
> *Most of you said that the death penalty was not apropos across the board, there are certain cases. And this is probably one of those cases.*

Tr., vol. X, at 92-93 (emphasis added).

The State makes much of the fact that the court incorporated all guilt stage evidence into the penalty phase of Mr. Smith's trial and that Mr. Watson referenced Mr. Smith's mental illness in the second stage. The State's own characterization of the first stage mental health evidence calls into question its worth in the second stage of trial. At the evidentiary hearing, the State asked Mr. Watson:

> And you didn't understand, necessarily, all the things [the doctors] said. I read them and I'm not sure I understand them. But they seemed to be saying there's mental issues here, mental problems, and throw a lot of words to the jury? . . . And so they accomplished the purpose. They looked and smelled and tasted like they were experts because they had all the words, and if you asked them a question,

they could give you a long answer with lots of long words and the bottom line was they say he's not competent?

E.H., vol. VIII, at 107-08. Mr. Watson agreed with this assertion.

Mr. Watson's penalty phase references to mental health evidence were at best belittling of the evidence and at worst damning of Mr. Smith. "I tried to point out with the testimony of the psychiatrist and the psychologist a real defense to this case," Mr. Watson told the jury. "Well, you took that credibility away." Tr., vol. X., at 93. At times, counsel's references to Mr. Smith's mental condition read like an argument for the State:

> I submit to you, whether you believe Dr. Murphy, Dr. King who didn't testify or whoever, there is no question that this man has acted bad in the past and there's no doubt in my mind if he's out in society he's going to continue to act bad. But if he's confined behind the bars for the rest of his life they might have doctors there, and I don't know whether they do or don't, but there's a chance, who will be able to get him to come out. . . .
> I'll also submit to you that, be it right or be it wrong, this person has some type of an abnormality. It's not normal for human beings, male human beings, to go out and want to stab on female human beings. That's not normal behavior. I also submit to you it's not normal behavior to stab people, kill five people and then wanting to go to sleep. That's not normal behavior. . . .
> [N]o logical person, no person acting in their right mind . . . would commit this type of act without some driving force.

Tr., vol. X, at 85-86, 88, 91. What that "driving force" might have been, however, Mr. Smith's counsel never sought to define. It was left to the prosecution to fill in the blank: Mr. Smith was a "cold-blooded, vicious killer[]." *See, e.g.*, *id.* at 96, 97, 101, 103, 105, 106, 107.

-40-

The mitigation evidence *available* for presentation was significant.  Mr. Smith is completely illiterate.  E.H., vol. X, at 388.  Even the State's experts and prison doctors determined Mr. Smith's IQ to be in the mentally retarded or borderline mentally retarded range.  E.H., vol. XI, at 675, 694; E.H., vol. XII, at 740.  "His understanding and his emotional development and his ability to relate all seem to be fairly similar to what we would perceive to be a 12-year-old child."  E.H., vol. X, at 403.  When he was quite young, Mr. Smith nearly drowned and the resulting lack of oxygen caused brain damage, or hypoxia.  E.H., vol. XI, at 565-66; E.H., vol. X, at 374.  At the evidentiary hearing, Dr. Hopewell explained the consequences of this injury:

> Brain damage generally affects three different components. One is the component we call intellectual thinking or cognitive. Another component of our development is our motor behavior, motor control. . . . And the third area is . . . emotional control and emotional regulation.  The other two areas also affect that.
> The brain injury, in general, will cause damage to the centers of the brain and an injury like an hypoxic injury is known to cause damage to the particular and specific centers of the brain that are involved in emotional regulation.  These are generally called the limbic areas of the brain and that's what helps to regulate and modulate our emotions.
> Injury of those areas can cause all sorts of problems. Primarily, . . . when a person is stressed or put in a stressful situation, their control over their emotions may break down even further.
> In addition to that would be intellectual and cognitive problems of brain injury. . . .  For example, intellectually they don't understand what's going on because of the intellectual component of the brain injury, then their emotional regulation is also disrupted, and so their behavior becomes erratic or out of control or aggressive, and

any number of emotional problems can result that are usually not consistent with whatever is going on in the environment around them, and that represents the direct cause of the brain injury, as well as an inability to cope or interact with stress or what's going on in the environment in a way that most of us would see to be reasonable or prudent or understandable.

E.H., vol. X, at 375-76.

Eva Cates, Mr. Smith's mother, corroborated Dr. Hopewell's conclusion that the near-drowning incident caused Mr. Smith's mental impairments. She testified at the evidentiary hearing that when he returned from the hospital, he was "slower, . . . he didn't act like he understood whatever I said to him." E.H., vol. XI, at 566. These changes led to taunting from other children, the taunting grew into tormenting, and eventually Mrs. Cates discovered her son was being beaten by his classmates. *Id.* at 571. As a result, Mrs. Cates kept Mr. Smith out of school for an entire year. *Id.* He eventually finished high school in a special education program. *Id.* at 572. He never received a driver's license, Tr., vol. V, at 99, and he lived with his mother until he moved in with his wife and her four children, E.H., vol. XI, at 572. Mrs. Cates understood that Mr. Smith had mental impairments, but was unable to afford any treatment. *Id.* at 567. In addition to testimony about Mr. Smith's mental condition, Mrs. Cates' evidentiary hearing testimony, unlike that at the penalty phase of his trial, described the unstable home in which Mr. Smith was raised and abuse at the hands of an aunt charged with his care. *Id.* at 559-65.

Clearly, evidence of Mr. Smith's mental retardation, brain damage, and troubled background constituted mitigating evidence. The Supreme Court has, time and again, cited "the standards for capital defense work articulated by the American Bar Association (ABA) . . . as 'guides to determining what is reasonable'" performance. *Wiggins*, 123 S. Ct. at 2536-37 (quoting *Strickland*, 466 U.S. at 688; *Williams v. Taylor*, 529 U.S. 362, 396 (2000)). Those standards repeatedly reference mental health evidence, describing it as "of vital importance to the jury's decision at the punishment phase." *See* ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases 1.1, 4.1, 10.4, 10.7, 10.11. It was patently unreasonable for Mr. Watson to omit this evidence from his case for mitigation. Mr. Smith has thus cleared *Strickland*'s first hurdle.

The district court concluded Mr. Smith failed to demonstrate prejudice from Mr. Watson's ineffective assistance at the penalty stage. We disagree. In considering *Strickland*'s prejudice prong, "we evaluate the totality of the evidence—both that adduced at trial, and the evidence adduced in habeas proceedings." *Wiggins*, 123 S.Ct. at 2543 (italics, quotations, and citations omitted). In order to grant relief, we must discern a reasonable probability that the jury would have concluded the "balance of aggravating and mitigating circumstances did not warrant death." *Mayes*, 210 F.3d at 1290. A "reasonable

-43-

probability" is less than a preponderance of the evidence, but "sufficient to undermine confidence in the outcome." *Fisher*, 282 F.3d at 1307 (quoting *Strickland*, 466 U.S. at 694).

We first note that the mitigating evidence omitted in Mr. Smith's trial is exactly the sort of evidence that garners the most sympathy from jurors. Death penalty litigation expert Dr. Craig Haney testified at the evidentiary hearing that "[j]uries respond to and find mitigating [this type of evidence,] and [they] are more likely to vote for life rather than death sentences in cases where there is . . . clear and clearly presented evidence that the defendant has suffered from some form of mental illness . . . ." E.H., vol. X, at 479-80. The available empirical evidence as to juror attitudes supports Dr. Haney's conclusions. *See* Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What Do Jurors Think?*, 98 COLUM. L. REV. 1538, 1559 (1998) (finding evidence of mental retardation and mental illness to be the most persuasive mitigation evidence and to have practically no aggravating effect); Samuel P. Gross, *Update: American Public Opinion on the Death Penalty—It's Getting Personal*, 83 CORNELL L. REV. 1448, 1468-69 (1998) (finding mental retardation to be "much more" mitigating than other potential factors). *See also Glenn v. Tate*, 71 F.3d 1204, 1211 (6th Cir. 1996) (citing empirical evidence of juror sympathy to claims of "organic brain problems"); *Brewer v. Aiken*, 935 F.2d 850, 862 (7th Cir. 1991) (Easterbrook, J.,

concurring) (same).

The district court dismissed much of the mitigation evidence Mr. Smith presented because it "tends to portray [Mr. Smith] as an unstable individual with very little control over either his impulses or his 'alter' personalities" and would have "negated much of the mitigation evidence actually presented to the jury of [Mr. Smith's] good work history and friend's and relatives perception of [Mr. Smith] as a kind hearted person." *See Smith*, No. CIV-98-601-R, at 23-24. These statements reveal a fundamental misunderstanding of the purpose for which such mitigation evidence would have been presented. The jury already had evidence of Mr. Smith's impulsiveness and lack of emotional control.[11] What the jury wholly

_____

[11]In each case the district court cited in support of this alleged "double-edged" nature of mental health evidence Mr. Smith sought to present, any aggravating "edge" to such evidence had not previously been placed before the jury. *See Davis v. Executive Dir. of Dep't of Corr.*, 100 F.3d 750, 760, 761 (10th Cir. 1996) (defense attorney failed to present any evidence of defendant's alcoholism, but such evidence would have revealed to an otherwise unaware jury defendant's increased violence towards women when drinking); *Smith v. Massey*, 235 F.3d 1259, 1282 (10th Cir. 2000) (evidence of defendant's mental impairments, which were exacerbated by drugs and alcohol, was not before the jury and would have included otherwise unadmitted evidence of their causing violent outbursts); *McCracken v. Gibson*, 268 F.3d 970, 979-80 (10th Cir. 2001) (evidence of defendant's family history of schizophrenia and his own psychological problems had not been presented to the jury; such evidence could have undermined "residual doubt" defense and also introduced otherwise unadmitted negative testimony about defendant's behavior when consuming alcohol); *Cannon v. Gibson*, 259 F.3d 1253, 1277-78 (10th Cir. 2001) (no evidence of defendant's mental illness was before the jury and petitioner's proffered evidence would have shown jury his instability and impulsiveness). Here, whatever aggravating "edge" there was to Mr. Smith's mental impairments

(continued...)

lacked was an *explanation* of how Mr. Smith's organic brain damage caused these outbursts of violence and caused this "kind hearted" person to commit such a shocking crime.

We have previously emphasized that mitigation evidence "affords an opportunity to humanize and *explain*." *Romano*, 239 F.3d at 1180 (quoting *Mayes*, 210 F.3d at 1288) (emphasis added). In granting relief from a death sentence under circumstances quite similar to those before us, the Supreme Court noted that evidence of borderline mental retardation and childhood privation and abuse is "consistent with the view that [the petitioner's] behavior was a compulsive reaction rather than the product of cold-blooded premeditation." *Williams*, 529 U.S. at 398; *see also Simmons v. Luebbers*, 299 F.3d 929, 936 (8th Cir. 2002) (granting relief from a death sentence and noting: "The jury was already aware of Simmons's anger towards women. [A psychiatrist's] report would have introduced the possibility that Simmons's inability to control his violent behavior was caused by childhood trauma and abuse. This information could have been used in his favor at the penalty stage. Instead, the jury was

---

[11](...continued)
was squarely before the jury in the guilt phase of the trial. It is the mitigating "edge" Mr. Watson failed to present. The district court also cited *Humphreys v. Gibson*, 261 F.3d 1016 (10th Cir. 2001), but that case is wholly inapposite as in that case extensive mitigating evidence reached the sentencer and further evidence the petitioner cited to the habeas court was merely cumulative. *Id.* at 1020-21.

allowed to conclude that Simmons's violent behavior was simply the result of his wicked and aggressive nature.")

The jury in Mr. Smith's case never received an explanation for his behavior. As described by the State, at the guilt phase Mr. Watson threw medical testimony at the jury and hoped something would stick. E.H., vol. VIII, at 107-08. In the penalty phase, he negated whatever value this mental health evidence had, essentially telling the jury not to consider it. He then presented the sort of "halfhearted mitigation case" derided by the Supreme Court in *Wiggins*. *See Wiggins*, 123 S. Ct. at 2538.

The State's case in favor of the death penalty was strong. The jury found four aggravating circumstances as to Mrs. Smith's death and five as to the deaths of each child. O.R., vol. III, at 542-51. But the aggravating evidence in *Williams*, where the Supreme Court reversed a death sentence for ineffective assistance of counsel, was also strong. As Justice Rehnquist pointed out in dissent over the Court's finding of prejudice:

> The murder of Mr. Stone was just one act in a crime spree that lasted most of Williams's life. Indeed, the jury heard evidence that, in the months following the murder of Mr. Stone, Williams savagely beat an elderly woman, stole two cars, set fire to a home, stabbed a man during a robbery, set fire to a city jail, and confessed to having strong urges to choke other inmates and to break a fellow prisoner's jaw.

*Williams*, 529 U.S. at 418 (quotations omitted). As we noted above, the

-47-

mitigation case presented by Mr. Watson was pitifully incomplete, and in some respects, bordered on the absurd.[12] We conclude, much as the Supreme Court did in *Wiggins*, that "had the jury been able to place" Mr. Smith's background, brain damage, and mental retardation—this compelling *explanation* for his behavior—"on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a different balance."[13] *Wiggins*, 123 S. Ct. at 2543; *see also Williams*, 529 U.S. at 398 ("[T]he graphic description of Williams' childhood, filled with abuse and privation, or the reality that he was 'borderline mentally retarded,' might well have influenced the jury's appraisal of his moral culpability.").

In sum, Mr. Smith presented evidence sufficient to undermine our confidence in his death sentence. Mr. Smith's counsel failed to afford him a constitutionally adequate representative in the sentencing phase of his trial, and he therefore is entitled to relief under *Strickland*, 466 U.S. at 694.

---

[12]The state made quick work of Mr. Watson's plea that the jury find mitigation in a lack of stab wounds on Shemeka and Kanesha Carter:

> He wants you to give him credit because he squeezed them to death instead of stabbed them. Does the fact that he squeezed the life out of them, . . . that he took them and squeezed their little bodies until they no longer could breathe, and we don't know how long that took and how they suffered while he was doing that, does that reduce the degree of moral culpability or blame?

Tr., vol. X, at 73.

[13]The jurors at Mr. Smith's trial had to reach a unanimous recommendation of death. OKLA. STAT. tit. 21, § 701.11.

# V.

## CONCLUSION

While the bulk of Mr. Smith's claims are without merit, he is entitled to relief as a result of his trial counsel's ineffective assistance at sentencing. We, therefore, **AFFIRM** the district court's denial of the writ as to Mr. Smith's conviction, but **REVERSE** the judgment of the district court denying the writ as to sentencing. We grant the writ with respect to the death sentence with the condition that the state resentence Mr. Smith within a reasonable time.