**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**October 26, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

LARRY D. MAYNARD,

   Petitioner-Appellant,

v.

BOBBY BOONE,

   Respondent-Appellee.

No. 05-5063

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**
**(D.C. NO. CV-01-79-CVE-SAJ)**

Fred Randolph Lynn, Tulsa, Oklahoma for Petitioner-Appellant.

Jay L. Schniederjan, Assistant Attorney General (W. A. Drew Edmondson, Attorney General, with him on the brief), Office of the Attorney General of Oklahoma, Oklahoma City, Oklahoma for Respondent-Appellee.

Before **LUCERO**, **ANDERSON**, and **TYMKOVICH**, Circuit Judges.

**TYMKOVICH**, Circuit Judge.

Larry D. Maynard is currently serving a life sentence in Oklahoma state prison arising from a crime that occurred in 1988. He was charged with shooting with intent to kill, and after a lengthy round of competency determinations, an

Oklahoma jury determined he was competent to stand trial. Before trial, Maynard dismissed his appointed counsel and moved to proceed pro se. The court granted this request, and Maynard was convicted of the charged crime. His conviction was later affirmed on appeal.

In 2001, he challenged the conviction in federal court, raising numerous claims pursuant to 28 U.S.C. § 2254. The district court denied the petition on the merits. Maynard challenges the decision on two grounds: (1) he was not competent to stand trial; and (2) he did not validly waive his right to counsel.

We AFFIRM.

## I. Background

On March 4, 1988, Maynard shot James Cass while Maynard was sitting in his car outside a lounge in Pawhuska, Oklahoma. After a short investigation, Maynard was charged in Osage County, Oklahoma for shooting with intent to kill.[1]

Maynard faced charges in an unrelated criminal matter in Delaware County, Oklahoma at the time of his arrest. As a result of questions about Maynard's competency in those proceedings, a Delaware County jury found Maynard incompetent to stand trial. He was committed to the care of an Oklahoma state hospital. Based on the Delaware County finding of incompetence, the Osage

---

[1] This charge was subsequently amended to shooting with intent to kill after two or more felonies.

County court stayed proceedings in its case and directed the hospital to continue monitoring Maynard's condition.

For the next year, doctors found Maynard incompetent to stand trial. In March 1989, however, hospital officials concluded Maynard's condition had improved to the point he was competent to stand trial. A second competency trial in Delaware County was held, and a jury found Maynard could stand trial. The Osage County District Attorney recommenced proceedings in September 1989 on the criminal charge pending there.

Maynard requested a competency hearing in the Osage County case. The court convened a jury, and on September 4, 1990, Maynard was found competent to stand trial. Trial was set for March 19, 1991.

Prior to trial, dissatisfied by his counsel's representation, Maynard moved to waive his right to be represented by counsel so he could proceed pro se. The court held a hearing on March 18, 1991, and then granted Maynard's motion and allowed him to proceed without representation.

Following a four-day trial, a jury found Maynard guilty of shooting with intent to kill and recommended ninety-nine years imprisonment. Maynard appealed the verdict, but because of various procedural difficulties, the Oklahoma Court of Criminal Appeals (OCCA) did not issue an opinion in the case for over eight years. Finally, in May 1999, the OCCA vacated the conviction on the ground that the Osage County court had instructed the jury to apply an

-3-

unconstitutionally high burden of proof to establish incompetency. Because so much time had passed, the OCCA remanded the case to the trial court to determine whether a retrospective hearing under the proper constitutional standard was feasible.

The trial court concluded that a retrospective hearing was feasible. In December, 1999, a second jury concluded that Maynard had been competent to stand trial in 1991. On direct appeal in 2000, the OCCA affirmed the jury's determination of competency and upheld his conviction, rejecting Maynard's other claims of error from the original proceeding.

Maynard originally filed his petition pro se, raising twelve points of error. The district court appointed counsel for Maynard, who narrowed Maynard's claims to two central issues: (1) whether the trial court wrongly concluded Maynard was competent to stand trial, and (2) whether Maynard's Sixth Amendment waiver of counsel was valid. A magistrate judge for the Northern District of Oklahoma recommended that the district court grant the petition on both grounds. The district court disagreed, concluding instead that the evidence was sufficient on habeas review to sustain the jury's findings of competence, and, that Maynard had validly waived his right to counsel. This appeal followed.

## II. Standard of Review

This case requires us to enter the labyrinth of collateral review under the Antiterrorism and Effective Death Penalty Act (AEDPA).[2] "In an appeal of the dismissal of a federal habeas corpus petition, we review a district court's findings of fact for clear error and its conclusions of law de novo." *Robinson v. Golder*, 443 F.3d 718, 720 (10th Cir. 2006) (quotation omitted).

Under AEDPA, when we review a state court decision that resolved an appeal on the merits, as in this case, we will grant a writ of habeas corpus only if the decision "was *contrary to*, or involved an *unreasonable application* of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1) (emphasis added); *accord Parker v. Scott*, 394 F.3d 1302, 1308 (10th Cir. 2005). When reviewing factual challenges, AEDPA also authorizes federal courts to grant the writ only where the state decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

Within the standard of review for legal questions provided by § 2254(d)(1) are two distinct standards: the "contrary to" standard and the "unreasonable application" standard. *Williams v. Taylor*, 529 U.S. 362, 404 (2000). For a decision to be "contrary to" clearly established federal law, a petitioner could show that the state court "applies a rule that contradicts the governing law set

_____

[2] AEDPA requires that Maynard exhaust his state court remedies before we can grant habeas, 28 U.S.C. § 2254(b)(1)(A). While he has not done so, we may still deny his grant of habeas on the merits, as we do herein. *Id*. at § 2254(b)(2).

forth in [Supreme Court] cases" or that "the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from our precedent." *Id.* at 405.

"[A] run-of-the-mill state-court decision applying the correct legal rule from [Supreme Court] cases to the facts of a prisoner's case would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." *Id.* at 406. These cases, instead, are governed by the "unreasonable application" standard, which applies to "[a] state-court decision that correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Id.* at 407–8.

The Supreme Court has offered some guidance in interpreting the "unreasonable application" standard. In *Williams*, the Court acknowledged that although "[t]he term 'unreasonable' is no doubt difficult to define. . . . [I]t is a common term in the legal world and, accordingly, federal judges are familiar with its meaning." 529 U.S. at 410. The Supreme Court subsequently explained that "the range of reasonable judgment can depend in part on the nature of the relevant rule." *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). The Court continued:

> If a legal rule is specific, the range may be narrow. Applications of the rule may be plainly correct or incorrect. Other rules are more general, and their meaning must emerge in application over the course of time. Applying a general standard to a specific case can demand a substantial element of judgment. As a result, evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case by case determinations.

*Id.*

The test for granting a writ under this standard is "whether the state court's application of clearly established federal law was *objectively unreasonable*." *Williams*, 529 U.S. at 409 (emphasis added); *see also Parker*, 394 F.3d at 1308 (noting that this is "an objective standard"). The question of objective unreasonableness lends itself to a range of interpretations. At one end of the range, the Supreme Court has held "objectively unreasonable" does not require "all reasonable jurists would agree [] the state court was unreasonable." *Williams*, 529 U.S. at 377.

At the other end, even a clearly erroneous application of federal law is not objectively unreasonable. In *Williams*, the Court held that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Id.* at 410; *accord Parker*, 394 F.3d at 1308. Thus, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams*, 529 U.S. at 411; *accord McLuckie v. Abbott*, 337 F.3d 1193, 1197 (10th Cir. 2003); *see Anderson v. Mullin*, 327 F.3d 1148, 1153 (10th Cir. 2003) ("[W]e may not grant habeas relief merely because we disagree with the state court's application of [constitutional] principles.").

The Supreme Court recently reaffirmed these principles: "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). It continued, "The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness. It is not enough that a federal habeas court, in its independent review of the legal question, is left with a firm conviction that the state court was erroneous." *Id.* (internal citations and quotations omitted). In describing this range established by the Supreme Court, the Second Circuit observed "that an 'objectively unreasonable' application of Supreme Court precedent falls somewhere between 'merely erroneous and unreasonable to all reasonable jurists.'" *Henry v. Poole*, 409 F.3d 48, 68 (2d Cir. 2005). In light of *Lockyer*, we add that objective unreasonableness is somewhere between *clearly* erroneous and unreasonable to all reasonable jurists.

Our circuit has yet to provide much guidance in applying these standards of review. Other circuits, however, have sought to give content to the range of reasonableness suggested by the Supreme Court. The Second Circuit explained, "Some increment of incorrectness beyond error is required," but it continued, "the increment need not be great; otherwise habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence. We do not believe AEDPA restricted federal habeas corpus to that extent." *Monroe v.*

*Kuhlman*, 433 F.3d 236, 246 (2d Cir. 2006) (internal citations and quotations omitted); *accord Santiago v. Spencer*, 346 F.3d 206, 211 (1st Cir. 2003).

Staking out a different formulation, the Seventh Circuit has suggested that "an unreasonable state court decision is one lying well outside the boundaries of permissible differences of opinion or one that is at such tension with governing U.S. Supreme Court precedents, or so inadequately supported by the record, or so arbitrary as to be unreasonable." *Badelle v. Correll*, 452 F.3d 648, 655 (7th Cir. 2006) (internal citations and quotations omitted).

The majority of circuits, including ours, have applied *Williams* and its progeny on its own terms without attempting to clarify or explain what it means for a decision to be objectively unreasonable.[3] *See, e.g.*, *Parker v. Scott*, 394 F.3d 1302, 1308–9 (10th Cir. 2005); *Cook v. McKune*, 323 F.3d 825, 839 (10th Cir. 2003); *Paine v. Massie*, 339 F.3d 1194, 1198 (10th Cir. 2003); *Spears v. Mullin*,

---

[3] These courts have not articulated a standard beyond that issued by the Supreme Court, perhaps because, as the Fifth Circuit put it:

> Imposing a surrogate "unreasonableness" standard at this time would be a risky proposition, as our redefinition might prove unfaithful to the Supreme Court's intended meaning. Undoubtedly, the term "objectively unreasonable" will acquire some definition (as distinguished from a definition) through the course of its application by federal habeas courts in individual cases. To the extent that a nuanced, contextual interpretation of "objectively unreasonable" emerges from this process over time, this elaboration will be more useful and meaningful than any definition we might choose to impose ab initio.

*Neal v. Puckett*, 286 F.3d 230, 246 n.14 (5th Cir. 2002).

343 F.3d 1215, 1229 (10th Cir. 2003); *Warren v. Kyler*, 422 F.3d 132, 138 (3d Cir. 2005); *Walker v. True*, 401 F.3d 574, 579 (4th Cir. 2005), *vacated on other grounds*, 126 S. Ct. 1028 (2006); *Murphy v. Dretke*, 416 F.3d 427, 432 (5th Cir. 2005); *Lopez v. Wilson*, 426 F.3d 339, 357 (6th Cir. 2005); *Swartz v. Burger*, 412 F.3d 1008, 1009–10 (8th Cir. 2005); *Kesser v. Cambra*, 392 F.3d 327, 335–36 (9th Cir. 2004); *Jones v. Campbell*, 436 F.3d 1285, 1293 (11th Cir. 2006).

On balance, we agree with those courts that grant considerable deference to state court decisions. AEDPA was enacted to "further the principles of comity, finality, and federalism." *Williams v. Taylor*, 529 U.S. 420, 436 (2000).[4] Thus, only the most serious misapplications of Supreme Court precedent will be a basis for relief under § 2254. In our view, a decision is "objectively unreasonable" when most reasonable jurists exercising their independent judgment would conclude the state court misapplied Supreme Court law. It is not enough that the decision is clearly wrong or that the reviewing court would have reached a contrary decision. In other words, to repeat the Seventh Circuit, the state court decision must be "at such tension with governing U.S. Supreme Court precedents, or so inadequately supported by the record, or so arbitrary as to be unreasonable." *Badelle*, 452 F.3d at 655 (internal citations and quotations omitted).

### III. Analysis

[4] Two separate Supreme Court cases titled *Williams v. Taylor* regarding AEDPA were published back-to-back. This case is not the same case as that cited earlier in this opinion.

With the standard of review in mind, we turn to Maynard's objections on appeal. He makes one central claim: he was not competent to waive his right to an attorney or to stand trial. From this central proposition, he argues that the Oklahoma courts (1) applied the wrong legal standard in determining competency; (2) erroneously concluded sufficient evidence existed to support the jury findings of competency; (3) improperly allowed a retrospective hearing eight years after the trial to determine competency; and (4) wrongfully allowed him to waive his right to counsel.

Our review is fifteen years after a jury concluded Maynard to be competent, and six years after a second jury found him competent in a retrospective hearing. We are troubled by this time table as well as much of the evidence introduced in the proceedings below. But as we discussed above, the standard is not our subjective reaction to the evidence. We are required to look at the state court decisions through the lens of AEDPA.

Based on that review, we conclude that the district court did not err in denying Maynard's petition for relief.

*A. Competency*

*1. Jury Instructions*

Maynard argues that he was incompetent throughout the proceedings in Osage County and that the jury determinations of competency were based on the wrong standard. Prior to trial, two juries—one in Delaware County in 1989, the

other in Osage County in 1990—concluded that Maynard was competent. The Osage County determination led to Maynard's trial in the underlying case at issue in this habeas petition. On direct appeal of Maynard's 1991 trial, however, the OCCA concluded the trial court had applied the wrong burden of proof in the competency determination. Instead of applying a preponderance of the evidence standard, the jury was instructed to find lack of competency by clear and convincing evidence, a standard the Supreme Court rejected in *Cooper v. Oklahoma,* 517 U.S. 348 (1996). The OCCA therefore remanded Maynard's case back to the trial court for two reasons: (1) to determine if a retrospective hearing was possible to assess competence under the correct legal standard, and (2) to conduct a retrospective hearing if it were possible. A second jury in 1999, concluding the hearing was feasible, found Maynard was competent at the time of his trial in 1991 under the preponderance of the evidence standard.

"A criminal defendant [cannot] be tried unless he is competent." *Godinez v. Moran*, 509 U.S. 389, 396 (1993). The Supreme Court has held that the standard both for competence to stand trial and to waive counsel is the same: "whether the defendant has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and has a rational as well as factual understanding of the proceedings against him." *Id*. (citing *Dusky v. United States*, 362 U.S. 402 (1960)) (internal quotations omitted). The key is

-12-

whether the defendant has a rational and factual understanding of the proceedings.

*Id.*

The instructions given to the jury provided:

It is necessary that you understand what certain terms used in these instructions mean in the law.  The following definitions apply here:

1.  "competent" or "competency" means the ability of a person arrested for or charged with a crime to understand the nature of the charges and proceedings brought against him and to effectively and rationally assist in his defense.

2.  "Incompetent" or "incompetency" means the inability of a person arrested for or charged with a crime to under stand the nature of the charges and proceedings brought against him and to effectively and rationally assist in his defense.

State Court Records, Original Record, Vol. II, 155.

The district court found that the instruction satisfies *Godinez* and *Dusky*. We agree.  The concept of rationality is presented squarely in the instruction.  To satisfy the instruction, the jury would have to find that the defendant understood the nature of the charges against him and was able to effectively and rationally assist counsel.  To do both would obviously meet *Dusky*'s requirement that the defendant have a rational and factual understanding of the proceedings.  *Id.*  The omission of the word "factual" in the instruction, as suggested by Maynard, detracts little from the overall thrust of the instruction.  Oklahoma courts have repeatedly concluded this instruction meets the *Dusky* standard.  *See Gilbert v. State*, 951 P.2d 98 (Okla. Crim. App. 1997); *Valdez v. State*, 900 P.2d 363 (Okla.

Crim. App. 1995); *Perry v. State*, 893 P.2d 521 (Okla. Crim. App. 1995); *Lambert v. State*, 888 P.2d 494, 498 (Okla. Crim. App. 1994).

Accordingly, we agree with the district court that Maynard is not entitled to relief on this ground.

### 2. *Sufficiency of Evidence*

Maynard also challenges the sufficiency of the evidence in support of the jury's finding of competence. He argues that the jury improperly rejected expert testimony of incompetence and wrongfully credited the testimony of lay witnesses. The district court found the evidence adequate to support the jury's determination and that the jury's conclusions were entitled to a presumption of correctness under 28 U.S.C. § 2254(e).

Sufficiency of the evidence is a mixed question of law and fact. We ask whether the facts are correct and whether the law was properly applied to the facts, which is why we apply both 28 U.S.C. § 2254(d)(1) and (d)(2) when reviewing sufficiency of the evidence on habeas. *See Hamilton v. Mullin*, 436 F.3d 1181, 1194 (10th Cir. 2006); *see also Hale v. Gibson*, 227 F.3d 1298, 1335 n.17 (10th Cir. 2000) (noting precedent has investigated sufficiency of the evidence both as a legal question and as a factual question). We are required to defer to any determination of factual issue by the state court due to the presumption of correctness afforded by § 2254(e). *Fields v. Gibson*, 277 F.3d 1203, 1221 (10th Cir. 2002). In applying this requirement, we have found that the

-14-

presumption can only be overcome by "clear and convincing" evidence that the defendant was incompetent at the time of trial. *Bryan v. Gibson*, 276 F.3d 1163 (10th Cir. 2001). We agree with the district court that Maynard has not overcome this presumption.

Maynard has not established by clear and convincing evidence that the jury erred.[5] First, the jury heard from a lay witness (an official at the jail where Maynard spent two years) who testified that Maynard understood the charges against him and was able to communicate with his attorneys. Second, Maynard testified at the proceeding and was able (1) to explain with some detail his understanding of the charges against him, (2) his distrust for lawyers arising from previous legal proceedings, and (3) his proposed defenses to the charges. Finally, the jury heard from an expert witness. The witness determined Maynard understood the charges brought against him, but he could not assist counsel because of his distrust of lawyers from previous cases. The state did not offer a rebuttal expert to this testimony.

Maynard argues this unrebutted expert testimony is enough to overcome the presumption of correctness. For two reasons, we disagree. First, as the district court found, the jury was entitled to weigh the conflicting evidence and its credibility. Second, the record shows that the expert testimony was cast in

---

[5] Two different juries concluded that Maynard was competent to stand trial before this appeal—first in 1989 and again in 1990.

sufficient doubt as to raise credibility concerns. The Oklahoma courts have "never required a jury to surrender its [] opinions to that of an expert witness" while further noting "[c]ompetency to stand trial is not merely a medical issue." *Ryder v. State*, 83 P.3d 856, 868, 870 (Okla. Crim. App. 2004) (upholding jury finding of competence despite determination from licensed psychologist to the contrary). Here, the expert was not a psychiatrist or psychologist. His background was in counseling. The expert only consulted with Maynard for an hour prior to his testimony. More importantly, the expert essentially conceded that Maynard understood the charges against him, although he had trouble working with his lawyers.

We agree with the district court that the jury's conclusions are presumed correct under § 2254(e). Maynard has not pointed to clear and convincing evidence that overcomes the presumption. While the record does not convince us that we would necessarily agree with the jury's determination of competence at first blush, we conclude a rational jury could have concluded that Maynard's testimony and the deficiencies in the expert testimony weighed in favor of finding competence. The determination in the first instance is for the jurors and we are not free to substitute our view of the evidence. Under AEDPA, a challenge to the sufficiency of the evidence must establish that no "rational trier of fact" could have found Maynard competent by a preponderance of the evidence. *Cf. Jackson*

*v. Virginia*, 443 U.S. 307, 319 (1979).[6]  On this standard, we cannot conclude that

the OCCA in reviewing the jury's finding unreasonably applied Supreme Court

precedent in denying Maynard's claim, nor can we find that the jury's factual

determination was unreasonable "in light of the evidence presented in the State

court proceeding."  § 2254(d).

Accordingly, the district court did not err in refusing to grant the petition

on this ground.

### 3. Retrospective Hearing

Maynard next argues that the district court erred in accepting the jury

competency determination based on a retrospective hearing.   On direct appeal,

the OCCA concluded that the jury applied the wrong standard for determining

competency.   It remanded the case to the trial court for a determination of

whether a retrospective competency hearing was feasible.  The trial court

concluded a hearing was feasible and, in 1999, retried the question of whether

Maynard was competent to stand trial in 1991.

Although "[r]etrospective competency hearings are generally 'disfavored,'"

they are "permissible whenever a court can conduct a meaningful hearing to

evaluate retrospectively the competency of the defendant."  *McGregor v. Gibson*,

---

[6] In *Jackson,* the sufficiency of the evidence was "beyond a reasonable
doubt," because that was the evidentiary burden for the issue at trial.
Competency, as we have noted, is determined based on a preponderance of the
evidence standard.

248 F.3d 946, 962 (10th Cir. 2001) (en banc) (citation omitted). In deciding

whether a retrospective competency hearing is feasible, a court should consider

four factors:

> (1) [T]he passage of time, (2) the availability of contemporaneous medical evidence, including medical records and prior competency determinations, (3) any statements by the defendant in the trial record, and (4) the availability of individuals and trial witnesses, both experts and non-experts, who were in a position to interact with defendant before and during trial, including the trial judge, counsel for both the government and defendant, and jail officials.

*Id.* at 962-63.

Applying these factors, the OCCA's decision is not contrary to clearly

established federal law. Maynard concedes that the third and fourth prongs cut in

favor of a retrospective hearing and takes issue only with the first two.

*Passage of Time.* It is undisputed that eight years passed between the first

trial and the retrospective hearing. Maynard argues that the Supreme Court has

held that six years was too long for a retrospective competency evaluation. *Pate*

*v. Robinson*, 383 U.S. 375, 387 (1966). In construing *Pate*, however, we have

held that a six-year delay was not too long, stating that "[t]he passage of time is

not an insurmountable obstacle if sufficient contemporaneous information is

available." *Clayton v. Gibson*, 199 F.3d 1162, 1169 (10th Cir. 1999) (internal

citations and quotations omitted). "A 'meaningful' determination is possible

where the state of the record, together with such additional evidence as may be

relevant and available, permits an accurate assessment of the defendant's condition at the time of the original state proceedings." *Id.*

While a lengthy time has passed, this is a case where the OCCA did not unreasonably apply Supreme Court precedent in concluding the available evidence "permit[ted] an accurate assessment of the defendant's condition at the time of the original state proceedings." *Id.* The only dispute is as to the availability of evidence from the earlier proceeding.

*Availability of Contemporaneous Evidence.* At the retrospective hearing, the availability of contemporaneous evidence was substantial. All of the witnesses from the prior trial were available. Maynard's testimony from the first trial was read into the record after he chose not to testify at the 1999 hearing. Maynard also called an additional witness, an inmate who had been jailed with him in 1991.

Maynard claims that many of his psychological records were not available at the 1999 hearing. He claims, for example, that various documents showing him incompetent to stand trial were destroyed by fire. (Aplt. Br. at 19, n.3.) But Maynard does not explain with any specificity what was missing, and nothing from the transcript of the 1999 hearing shows that Maynard was inhibited from introducing documents from the 1991 hearing or even that anything was missing from the first trial.

In the absence of specific reasons supporting this claim, the district court did not err in rejecting this argument. We agree that the OCCA's determination was not contrary to or an unreasonable application of Supreme Court law.

*B. Waiver of Right to Counsel*

We turn next to Maynard's claim regarding waiver of counsel. Because the OCCA reached this claim on the merits, we review for objective unreasonableness under AEDPA.

The Supreme Court has unequivocally held that the Sixth Amendment "grants to the accused personally the right to make his defense." *Faretta v. California*, 422 U.S. 806, 819 (1975). But since the right to counsel is also constitutionally guaranteed, a defendant may waive the right to counsel only if the waiver is knowing, intelligent, and voluntary. *Edwards v. Arizona*, 451 U.S. 477, 482 (1981); *Faretta*, 422 U.S. at 835; *see also United States v. Akers*, 215 F.3d 1089, 1097 (10th Cir. 2000) ("The right of self-representation . . . is not absolute."). Of course, whether a waiver was knowing, intelligent, and voluntary "depends in each case upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." *Edwards*, 451 U.S. at 482 (internal quotations omitted).

Before a court may grant a waiver, it must ensure the defendant is "aware of the dangers and disadvantages of self-representation, so that the record will establish that he knows what he is doing and his choice is made with eyes open."

*Faretta*, 422 U.S. at 835 (internal quotations omitted).  The trial judge has "the serious and weighty responsibility . . . of determining whether there is an intelligent and competent waiver by the accused."  *Johnson v. Zerbst*, 304 U.S. 458, 465 (1938)

The principal authority on "competent and intelligent" waiver is *Godinez v. Moran*, 509 U.S. 389 (1993), which reviewed a state court decision granting a defendant's motion to proceed pro se.  The Supreme Court held that the trial court will not discharge its duty to ensure the waiver was valid when it determined only that the defendant was competent to stand trial without probing whether the waiver was also knowing and intelligent.  A defendant "may not waive his right to counsel or plead guilty unless he does so 'competently and intelligently.'"  *Id.* at 396.

Thus, a trial court is obligated to conduct a two-part inquiry to ensure a waiver was valid.  *Id.* at 401.  First, the court must ensure the defendant is competent.  Second, the waiver must be knowing and voluntary.

*1. Competence.*

The Supreme Court has held that the standard of competency to plead guilty or waive the right to counsel was the same as the standard of competency to stand trial.  *Id.* at 398.  This standard considers whether the defendant has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and has "a rational as well as factual understanding of the

proceedings against him." *Id.* at 398 (quoting *Dusky v. United States*, 362 U.S. 402 (1960) (per curiam)).

We have concluded above that the jury did not err in finding that Maynard was competent to stand trial. And Maynard does not argue that the trial court had an obligation to make an additional query into his competence at the waiver hearing in light of the September 4, 1990 jury determination. Maynard was assisted by counsel at the waiver hearing. Counsel did not raise the question of competency to the trial court, or object to the hearing because of Maynard's mental state. Accordingly, we turn to whether the waiver was knowing and voluntary.

*2. Knowing and Voluntary.*

"In addition to determining that a defendant who seeks to plead guilty or waive counsel is competent, a trial court must satisfy itself that the waiver of his constitutional rights is knowing and voluntary." *Godinez,* 509 U.S. at 400. While a defendant's competence to waive counsel is no different than competence to stand trial, "there *is* a 'heightened' standard for pleading guilty and for waiving the right to counsel, but it is not a heightened standard of *competence*." *Id.* at 401.

> The focus of a competency inquiry is the defendant's mental capacity; the question is whether he has the ability to understand the proceedings. The purpose of the "knowing and voluntary" inquiry, by contrast, is to determine whether the defendant actually does understand the

-22-

significance and consequences of a particular decision and whether the decision is uncoerced.

*Id.* at 401 n.12.

The Court has repeatedly emphasized that this duty to ensure that a waiver is competent and knowing falls squarely on the trial court judge. When a defendant appears without counsel, a judge has a solemn duty "to make a thorough inquiry and to take all steps necessary to insure the fullest protection of this constitutional right at every stage of the proceedings." *Von Moltke v. Gillies*, 332 U.S. 708, 722 (1948). A trial judge must "investigate as long and as thoroughly as the circumstances of the case before him demand" to discharge this duty. *Id.* at 723. The court continued:

> The fact that an accused may tell [the court] that he is informed of his right to counsel and desires to waive this right does not automatically end the judge's responsibility. To be valid such waiver must be made with an [1] apprehension of the nature of the charges, the statutory offenses included within them, [2] the range of allowable punishments thereunder, [3] possible defenses to the charges and circumstances in mitigation thereof, and [4] all other facts essential to a broad understanding of the whole matter.

*Id.* at 724. In short, the colloquy must be a "penetrating and comprehensive examination of all the circumstances under which such a [waiver] is tendered." *Id.*; *see United States v. Smith*, 413 F.3d 1253, 1279 (10th Cir. 2005) (stating that defendant may proceed pro se only after trial court conducts "a thorough and comprehensive formal inquiry . . . on the record to demonstrate that the defendant

-23-

is aware of the nature of the charges, the range of allowable punishments and possible defenses, and is fully informed of the risks of proceeding pro se").

Nevertheless, the Supreme Court has made clear that "a criminal defendant's ability to represent himself has no bearing upon his competence to *choose* self-representation." *Godinez*, 509 U.S. at 400. As we noted in *Smith*, "The competence of a defendant's waiver of the right to counsel depends only on his competence in waiving that right, however, not on whether he is competent to represent himself at trial." 413 F.3d at 1279.

With these principles, we turn to the OCCA decision, which held that Maynard voluntarily waived his right to counsel.

*a. OCCA Rationale—Contrary to Supreme Court Precedent?*

In upholding Maynard's waiver, the OCCA did not cite any federal law, citing instead its own opinion in *Braun v. State*, 909 P.2d 783, 788–89 (Okla. Crim. App. 1995). This omission by itself is not fatal because "[e]ven if a state court resolves a claim in a summary fashion with little or no reasoning, we owe deference to the state court's result. . . . Unlike full de novo review, [our] independent review, is deferential because we cannot grant relief unless the state court's result is legally or factually unreasonable." *Paine v. Massie*, 339 F.3d 1194, 1198 (10th Cir. 2003) (internal quotations omitted).

Our review of *Braun* suggests that the OCCA essentially required the trial court, as a matter of law, to satisfy the two-part inquiry set forth in *Godinez*:

-24-

(1) competence to waive counsel and (2) knowing and intelligent waiver.  Under

*Braun*,

> the trial court is required to determine whether the accused has the capacity to make a valid waiver of counsel.  The court must then examine the defendant and determine whether the waiver is voluntary, knowing, and intelligent.  In doing this, the trial judge must clearly explain to the defendant the inherent disadvantages in such a waiver.

909 P.2d at 787.  This determination must be made "from the total circumstances of the individual case including background, experience, and conduct of the accused."  *Id.* at 788.

We find that this rule does not "contradict[] the governing law set forth in [Supreme Court] cases."  *Williams*, 529 U.S. at 405.  To the contrary, it is in perfect harmony with the precedent discussed above.  We thus cannot say that the OCCA determination "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).

*b.  OCCA Rationale—Objectively Unreasonable?*

Since *Braun* is not "contrary to" applicable Supreme Court precedent, we next consider whether the OCCA's application of that precedent was "objectively unreasonable" under the authority discussed above.  We conclude that it was not.

We have carefully reviewed the record of the trial court's independent waiver hearing held to probe the reasons for Maynard's desire to proceed pro se.  At that hearing, the trial court took pains to ensure that Maynard knew what he was charged with and what kind of penalty he faced.  It also probed Maynard's

-25-

understanding of the procedural aspects of the trial. Maynard's appointed counsel attended the hearing and assisted Maynard. Maynard testified about his desire to proceed pro se and was questioned by his counsel and the prosecutor. Maynard asserted a plan to raise a variety of defenses including insanity, involuntary intoxication, and entrapment. Maynard's counsel did not ask for additional mental testing at that time and agreed to withdraw as counsel at the conclusion of the hearing.

Needless to say, Maynard displayed an unrealistic and even foolish view of his case and possible defenses. He was more focused on the deficiencies of the court appointed counsel than on the merits of his defense. Most observers would agree the decision to proceed pro se is inherently irrational, but it is well established that a defendant's technical legal knowledge is "not relevant to an assessment of his knowing exercise of the right to defend himself." *Faretta v. California*, 422 U.S. 806, 836 (1975); *see also United States v. Baker*, 84 F.3d 1263, 1264 (10th Cir. 1996) ("The key question is whether the defendant is competent to waive his or her right to counsel, not whether the defendant possesses legal knowledge or is otherwise competent to represent him or herself.").

This case is especially difficult because of Maynard's history of mental illness. We recognize he was institutionalized at various points in these proceedings and was hampered by a variety of mental conditions whose force

cannot be precisely gauged from the cold record. Maynard suffered through a variety of mental illnesses prior to trial, and possibly afterwards. He had represented himself in legal proceeding before, and may have had a romanticized view of his ability to present a defense. Perhaps he believed his impairment defense would be helped by self-representation. In any event, we have no per se rule prohibiting defendants, even with troubling mental health histories, from waiving counsel.[7]

In disagreeing solely with whether Maynard's waiver was knowing and voluntary, the dissent points to the waiver hearing transcript to illustrate Maynard's confusion over certain aspects of the trial process. But Maynard need not understand all of the implications of waiver at the beginning of the waiver hearing, he only needs to understand them when the waiver is granted. Part of the reason for the more probing inquiry required when a defendant seeks to proceed

---

[7] The dissent notes that a trial court should probe deeper to determine whether a defendant understands the implications of waiver when the defendant suffers from limited mental capacity. While we do not quarrel with that sentiment, the trial court's colloquy here was not objectively unreasonable in determining that Maynard understood the consequences of the waiver. *Smith v. Mullin*, 379 F.3d 919 (10th Cir. 2004), is illuminating. In that case, we found that diminished mental capacity did not, by itself, invalidate a *Miranda* waiver. Even where the defendant's "cognitive abilities may have mirrored those of a twelve-year-old, this fact alone does not render his waiver ineffective." *Id.* at 933–34 (internal citation omitted). We looked to the totality of the circumstances and concluded that "while his memory was not wholly intact and his responses to answers came slowly, he stated his understanding of the *Miranda* rights, he comprehended the questions the officers presented, and he provided an accurate description of the crimes and crime scene." *Id.* at 934.

pro se is to determine aspects of the waiver that the defendant might not understand initially so that the implications of representing one's self at trial can be clarified. *See United States v. Turner*, 287 F.3d 980, 984 (10th Cir. 2002) (". . . knowing and intelligent means only that [the defendant] was reasonably informed by the court of the hazards of self-representation and had sufficient understanding of those hazards."). The contradictions that arise in the cited transcript are the product of the judge determining where Maynard might be confused about the implications of proceeding pro se and then working to mitigate Maynard's confusion about those issues. The cited excerpts demonstrate the judge walking Maynard through his misconceptions of the trial process and identifying the aspects of waiver that might conflict with Maynard's approach to trial. Maynard does not need to understand the consequences of waiving counsel when he makes the initial decision to waive, but the court must be satisfied the defendant understands the consequences when the waiver is granted.

The dissent points to Maynard's belief that "his attorney is conspiring against him, that he must testify, that he must retain his attorney to question him, that his attorney will help him prepare jury instructions after being unconditionally discharged, and that the court or the prosecutor will assist him" as evidence of Maynard's confusion. The first point was made to the jury in the competency hearing, which found him competent to stand trial. And while we agree with the dissent that Maynard was initially confused about the role of

-28-

advisory trial counsel, it was the trial court's job to sufficiently clear up those misconceptions so that Maynard could decide if he still wanted to proceed pro se. That is why the court went to such efforts to point out inconsistencies in Maynard's testimony. The transcript as a whole shows that the court sought to clarify the mistakes in Maynard's beliefs and then ensure Maynard understood those clarifications of the consequences of proceeding pro se before ultimately granting the waiver.

Our standard of review is objective unreasonableness. If this case had been before us in the first instance, we might well have reached a different conclusion. But we cannot say that Maynard's waiver of counsel and the OCCA's affirmance of it are inconsistent with the standards established by the Supreme Court. Accordingly, the district court did not err in denying the habeas petition on this ground.

## III. CONCLUSION

Based on the foregoing, we deny Maynard's claim for habeas relief and AFFIRM the district court's deference to the state court proceedings.

05-5063, Maynard v. Boone

**LUCERO**, J., concurring in part, dissenting in part.

I join my respected colleagues in all but Part III.B.2 of the majority opinion. Although they adopt the correct legal standard, and aptly note that this is a close matter, I disagree with the majority's conclusion that the Oklahoma courts reasonably applied federal law in finding that Maynard knowingly, intelligently, and voluntarily waived his right to counsel. On that issue, I respectfully dissent.

A defendant's decision to waive his right to counsel must not only be competent, but also knowing and voluntary. See Godinez v. Moran, 509 U.S. 389, 400-01 & n.12 (1993). A trial court can assure itself that "an accused's professed waiver of counsel is understandingly and wisely made only from a penetrating and comprehensive examination of all the circumstances" of the case. Von Moltke v. Gillies, 332 U.S. 708, 724 (1948). When a defendant has limited mental capacity, as does Maynard,[1] a court may need to take additional steps to ensure the defendant has a "rational as well as factual understanding" of the consequences of his waiver. See Dusky v. United States, 362 U.S. 402, 402 (1960).

---

[1] Maynard was deemed incompetent to stand trial in a separate case in 1988 and was confined in a state hospital for two years. While under state care he was diagnosed with organic brain syndrome, mild to moderate dementia, and mild mental retardation, having an I.Q. of 59.

The transcript of the waiver of counsel hearing clearly demonstrates that, despite the court's repeated attempts at explanation, Maynard did not understand the consequences of his waiver. I excerpt that transcript at some length to show the depth of Maynard's misapprehension of his rights:

Q. Have you seen your election to proceed pro se that you signed?

A. Yes, I read it, yeah.

Q. Well, why is it that in paragraph three you say you wanted [your appointed counsel] Mr. Standing Bear to stand by and then you tell me today you don't want him to stand by?

A. Because that's that mans [sic] conspiracy right there and his conspiracy to get me upset where the jury can see, like I did last time I was over there in Court.

Q. Do you say that [the prosecutor] Mr. Stuart and Mr. Standing Bear are conspiring to upset you in the presence of the jury in order to cause prejudice against you?

A. Yes.

Q. Is that why or one of the reasons why you do not want to have Mr. Standing Bear in the courtroom?

A. That is the reason, one of them.

[Tr. at 13]

-2-

Q. Do you intend to testify during the course of this trial yourself?

A. Yeah, I should, you know.

Q. Well, that's up to you, if the Court allows you to be your own attorney you are going to make these decisions, nobody is going to make them for you. Do you understand the Court---

A. I know I have to give my testimony and nobody---

Q. Do you understand the Court cannot help you in this trial if you proceed pro se?

A. I know that.

[Tr. at 27]

Q. If you choose to testify in this case, Mr. Maynard, and you don't have an attorney who is going to ask you the questions?

A. I'm just going to--- I ain't going to take the stand, you know.

Q. You just said that you were, now you're not?

A. No.

Q. Okay. If you were---

A. Because I know, you know, Mr. Standing Bear has throwed me in total confusion in these courtrooms like the wrong witness list and all that.

Q. Do you understand that you have no duty to testify in a criminal case as a Defendant?

A. Yes.

Q. Do you understand you have every right in the world to do so if that's your decision or your attorneys [sic] decision if you have one.

A. Yeah.

Q. So if you don't have an attorney and you wish to testify my question is, who is going to ask you the questions?

A. Well I'm going to have to have him here because I've got to take the witness stand.

Q. Now, you have vacillated a little bit, Mr. Maynard. You told me at the outset that you didn't want him in here.

A. Well, I don't even want him in there, you guys--- hey, I can't take the witness stand and he's sabotaging my defense and I've got him before the Bar Association right now and him too!

Q. Are you just getting frustrated at this time, Mr. Maynard?

A. Yes, you know, I ain't going to take the witness stand, let's proceed on.

Q. Well, this is a simple little hearing compared to the trial---

A. I know, I have been through trials.

Q. It might [take] two or three days, do you think you might get frustrated during that time?

A. No.

Q. But you are getting frustrated now?

A. Yeah.

Q. Okay, well, you understand that you can either choose to testify or not testify if you are your own attorney.

A. That's right.

Q. And if you choose to testify and you are your own attorney and Mr. Standing Bear isn't here to ask you questions you will just have to testify in narrative form, get up and tell a story. Do you understand the pitfalls in doing that Mr. Maynard?

A. Yeah.

[Tr. at 29-30]

Q. Do you wish to have him--- now, you told me you don't want him in the courtroom during this trial and that's your statement to me.

A. Yeah.

-5-

Q. You don't want him as standby counsel to assist you. Do you want him to assist you in the preparation of jury instructions once this case, all the evidence is presented to the jury?

A. Yeah.

Q. Do you want him---

A. Yeah, I want that.

Q. --- in that capacity?

A. Yeah.

Q. All right, do you understand that if you decide to represent yourself do you request that Mr. Standing Bear be totally and wholly discharged from any type of further representation of you either as your advocate or advisor, in other words, that he be unconditionally discharged?

A. Yeah.

Q. You do want him unconditionally discharged?

A. Yeah.

Q. Do you understand the inconsistency with what you just told me that you want him to work on your instructions---

A. Your Honor, I need somebody to help me and he ain't never helped me do nothing. I mean I can't get him, I can't beg him, I don't care what I do, man, I sent people down there, I can't get

-6-

nothing, I have had jailers ask him, I can't get him over to that jail. I have asked you to get him over there.

Q. Mr. Maynard, do you understand---

A. Why would he come over here and help me when he ain't helped me in seven months?

Q. Do you understand the inconsistency in one time you told me---

A. Just tell him I don't want him, period, you know, we'll just go with the instructions the way it is, you know. I don't want him around me, man, because he ain't been around me in seven months.

Q. Well, you have said three different things to the Court now and I don't know which to accept.

A. No.

Q. No what?

A. I don't want him in the jury instructions or nothing else because he ain't seen me in seven months.

Q. You wish to have him totally discharged and you want no assistance from him in any form, is that your statement?

A. Yeah.

Q. Should you determine that and request that Mr. Standing Bear be discharged from representing you in Court would you like for him to

assist you in getting your witnesses to Court on time so you can present your defense?

A. I want the witness list that I--- not the one that he submitted down here, I want the ones that we argued March the 11th here, nobody wants that witness list brought in here. I want the truth brought out.

Q. Well, we do too, Mr. Maynard. But the question is do you wish for Mr. Standing Bear to assist you in getting the witnesses to the Court when you put on your defense in this case if you represent yourself?

A. Somebody has got to because I---

Q. Well, now, you told me you don't want him for anything and now you---

A. Well, how am I going to do it over in that jail! Let me out of here on bond, you stuck a hundred and fifty thousand dollar bond on me. Let me get out so I can go get my own witnesses.

Q. That's the reason I'm asking the question, Mr. Maynard.

A. Yeah, I need somebody. How am I going to do it over in that little cell.

Q. All right, you want Mr. Standing Bear not to assist you during the trial to the jury. You don't want him to help you prepare the instructions in this case but you would like to utilize his services---

A. I want to submit his instructions, yeah.

Q. But you would like to utilize the services of Mr. Standing Bear in making arrangements to see that your witnesses are here timely during the trial?

A. Well, how about me submitting that you get them here on time.

Q. Mr. Maynard, I told you the Court cannot help you in this case.

A. Well, you can help me get my witnesses here, the right witnesses too.

Q. No, the Court cannot be an advocate in a jury trial---

A. How am I going to do it over in that jail?

Q. That's why I'm asking, would you like for Mr.---

A. Yeah, I got to have somebody, him or you or somebody.

Q. Mr. Stuart can't help you in this case [because] he represents the State, doesn't he?

A. Well, you guys have thrown me at a total disadvantage because I can't subpoena witnesses, I give a witness list out and I get the wrong one submitted to the Court.

Q. There is Mr. Standing Bear then that you say at this time you do wish that he not stay in the courtroom to assist you, he not help you with instructions but that he assist you in seeing that witnesses are here---

A. I got to have somebody to get my witnesses.

Q. At your request then.

A. Yes.

Q. All right, I understand what you said, I think.

[Tr. at 43-47]

Again and again Maynard displays confusion, seeming to believe alternatively that his attorney is conspiring against him, that he must testify, that he must retain his attorney to question him, that his attorney will help him prepare jury instructions after being unconditionally discharged, and that the court or the prosecutor will assist him.

Based on this record, the panel majority decides that the trial court's conclusion that Maynard knowingly, intelligently, and voluntarily waived his right to counsel was reasonable. My colleagues advance several bases for their conclusion: the trial court's repeated attempts to explain the procedural aspects of the trial, the actions of Maynard's appointed counsel, Maynard's discussion of

-10-

his planned defenses,[2] and his expressed desire to proceed pro se. None of these factors, however, bear on whether Maynard actually understood the consequences of his waiver. See Godinez, 509 U.S. at 401 n.12 ("The purpose of the 'knowing and voluntary' inquiry . . . is to determine whether the defendant actually does understand the significance and consequences of a particular decision.").

---

[2] Any fair reading of Maynard's planned defenses only bolsters the conclusion that he was mentally ill. What the majority characterizes as defenses based on insanity, involuntary intoxication, and entrapment are extracted from the following: After the colloquy quoted at length above, Maynard explained to the court that he intended to prove that his previous lawyers conspired with several individuals, including members of the mafia, to have him illegally released from prison, at which time he was drugged against his will and tricked into shooting the victim.

An excerpt from that transcript follows:

Maynard: You see, my defense is different. Mine is this drug deal and conspiracy that they conspired to set me up, you know, they got me released out of jail for the sole purpose of having this Brenda Butler set me up, that is my conspiracy defense.
. . .
The Court: Conspiracy among or between whom?
A. [Named individuals] and some mafia guys---
Q. Mafia, what mafia?
. . .
Q. Where are the mafia guys?
A. They are up there at Grand Lake.
Q. Oh, one of the Grand Lake mafia boys?
A. Yeah.
. . .
Q. What does [the proposed witness] know about this case?
A. Well, she knows that she was slipping chemicals in me for months driving me crazy, you know, and these charges she put on me that was the sole purpose of it.

[Tr. at 64-66]

-11-

Although the standard governing our review of this claim is highly deferential, it is plain that Oklahoma allowed a mentally ill man to represent himself.  I would hold that this decision was  "an unreasonable application of, clearly established Federal law."  28 U.S.C. § 2254(d)(1).